Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 11, 2003        Decided July 1, 2003

No. 02-1093

RANGER CELLULAR AND MILLER COMMUNICATIONS, INC.,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

On Petition for Review of an Order of the
Federal Communications Commission

*Donald J. Evans* argued the cause and filed the briefs for petitioners.

*Stanley R. Scheiner*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *R. Hewitt Page*, Acting Assistant Attorney General, U.S. Department of Justice, *Catherine G. O'Sullivan*, Chief Counsel, *Andrea Limmer*, Attorney, *John A.*

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Rogovin*, Deputy General Counsel, Federal Communications Commission, and *Daniel M. Armstrong*, Associate General Counsel. *Pamela L. Smith*, Counsel, entered an appearance.

Before: GINSBURG, *Chief Judge*, and EDWARDS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Ranger Cellular and Miller Communications, Inc. (sometimes hereinafter referred to collectively as Ranger) petition for review of an order in which the Federal Communications Commission interpreted a provision in the Balanced Budget Act of 1997, Pub. L. No. 105–33, 111 Stat. 251, 47 U.S.C. § 309(*l* ), to allow new applicants to apply for certain cellular telephone licenses. Ranger, which had submitted an application for a cellular license several years beforehand, argues that providers of cellular telephone service are "commercial radio or television stations" within the meaning of 47 U.S.C. § 309(*l* ), for which the Commission may not accept new applications. The petitioner also claims that, even if the statute did not bar new cellular applications, the Commission departed from precedent in holding that the public interest would be served by its accepting new applications, and that the Commission opened the applicant pool with the unlawful purpose of enhancing federal revenues, in violation of 47 U.S.C. § 309(j)(7)(B). We reject Ranger's arguments and deny the petition for review.

## I.  Background

Prior to 1993 the Commission awarded licenses for use of the radio spectrum through either a comparative hearing or a lottery. Lottery entrants would file a simple application and pay a nominal fee. The Commission then held the lottery and determined a winner, subject to the losing parties' right to file a petition to disqualify the winner. If the winner was disqualified, then the Commission held another lottery. After 1986 the Commission used the lottery system exclusively to assign all cellular licenses.

The comparative hearing process, which required each party to present a detailed case to the Commission showing why it should win the license, was far more complex and often led to protracted litigation. *See, e.g., Bechtel v. FCC*, 957 F.2d 873 (D.C. Cir. 1992); Douglas H. Ginsburg, Michael H. Botein, & Mark D. Director, Regulation of the Electronic Mass Media: Law and Policy for Radio, Television, Cable and the New Video Technologies 85–134 (West 2d ed. 1991). The Commission had used the comparative hearing process to choose among competing applications for broadcast stations since the decision in *Ashbacker Radio Corp. v. FCC*, 326 U.S. 327 (1945).

Ranger and Miller filed applications in 1988 and 1989 respectively to participate in a lottery for certain Rural Service Area (RSA) cellular telephone licenses. The Commission awarded most of the licenses but by the mid–1990s six licenses for RSAs were still pending due to the disqualification or withdrawal of the original winner. The Commission then granted interim operating authority (IOA) to cellular telephone licensees in adjacent areas to provide service until such time as the Commission awarded a permanent license. *See In the Matter of Implementation of Competitive Bidding Rules to License Certain Rural Service Areas, Notice of Proposed Rule Making*, 16 FCC Rcd. 4296, ¶ 9 & n.21 (2001).

Meanwhile, the Congress, in the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103–66, § 6002(a), 107 Stat. 312, 387, had amended the Communications Act of 1934 by adding § 309(j), 47 U.S.C. § 309(j), which authorized the Commission to award almost all spectrum licenses by competitive bidding and limited the use of lotteries. With respect to cellular telephone licenses in particular, the 1993 legislation provided that the Commission: "shall not issue any license or permit [by lottery] . . . unless . . . one or more applications for such license were accepted for filing by the Commission before July 26, 1993." § 6002(e), 107 Stat. at 397. Having been given the option of proceeding by lottery or by competitive bidding to award such grandfathered licenses, the Commission decided initially to use a lottery, *see In the Matter of Implementation of Section 309(j) of the Communications*

*Act–Competitive Bidding*, 9 FCC Rcd. 7387 (1994), but then decided to study the matter further. *See Public Notice*, Wireless Telecommunications Bureau Postpones Cellular Telecommunications Service Lottery for Rural Service Areas, Mimeo No. 65051 (Sept. 10, 1996).

Before the Commission had finally decided how to award cellular telephone licenses, however, the Congress passed the Balanced Budget Act of 1997, Pub. L. No. 105–33, § 3002(a), 111 Stat. 251, which amended § 309(j) by requiring the Commission to use competitive bidding (except in a few specifically enumerated circumstances) and terminated the Commission's authority to use a lottery (except for a small class of broadcast licenses). *See* 47 U.S.C. § 309(i). More important for the purposes of this case, the Congress amended the Communications Act of 1934 by adding § 309(*l* ), which states, under the heading "Applicability of competitive bidding to pending comparative licensing cases," that:

> With respect to competing applications for initial licenses or construction permits for *commercial radio or television stations* that were filed with the Commission before July 1, 1997, the Commission shall . . . treat the persons filing such applications as the only persons eligible to be qualified bidders for purposes of such proceeding.

(Emphasis added). This section bars the Commission from accepting new applications for certain "commercial radio or television stations." The Conference Report on the 1997 Act described the scope of this provision as follows:

> The conferees adopted a new provision with respect to the applicability of competitive bidding to pending comparative licensing cases. New section 309(*l* ) of the Communications Act requires the Commission to use competitive bidding to resolve any mutually exclusive applications for *radio or television broadcast licenses* that were filed with the Commission prior to July 1, 1997.

H.R. Conf. Rep. No. 217, 105th Cong., 1st Sess. at 573 (1997) (emphasis added).

Against this background, the Commission in April 1999 dismissed all pending applications for the cellular telephone licenses at issue in this case because it was "without authority to process the pending mutually exclusive RSA applications pursuant to the rules and requirements [of the lottery system] under which they were filed." *In the Matter of Certain Cellular Rural Service Area Applications*, 14 FCC Rcd. 4619, ¶ 5 (WTB 1999). In 2001 the Commission proposed to open eligibility with respect to the auctions it would hold for the pending RSA cellular telephone licenses. *See Implementation of Competitive Bidding Rules*, 16 FCC Rcd. ¶ 1. After receiving comments the Commission issued the order here under review. *In the Matter of Implementation of Competitive Bidding Rules to License Certain Rural Service Areas*, 17 FCC Rcd. 1960 (2002) (*Order*).

The Commission rejected Ranger's argument that the term "commercial radio or television stations" in § 309(*l*) included cellular telephone licenses and therefore required the Commission to limit the pool of bidders to those who had filed an application prior to July 1, 1997. The Commission reasoned that the statute – by its terms and in accordance with its purpose and its legislative history – in using the phrase "commercial radio and television stations" referred only to broadcast stations and therefore did not cover cellular telephone services. The Commission went on to decide that competitive bidding with open eligibility would best serve the public interest: "the bidder who is willing to pay the most will be highly motivated to rapidly put the license to a use that the public finds valuable because only such a use will make its investment worthwhile." *Id.* ¶ 13. The Commission also rejected Ranger's comment that an auction would violate 47 U.S.C. § 309(j)(7)(b), which prohibits the Commission, in making certain regulatory decisions, from "bas[ing] a finding of public interest, convenience, and necessity solely or predominantly on the expectation of Federal revenues from the use of a system of competitive bidding under this subsection." The Commission explained: "Our determination to permit open eligibility in the RSA auction is based on our statutory obligations to promote competition and rapid deployment of

services to rural areas, not to enhance the Federal Treasury." *Id.* ¶ 21.

The Commission conducted the auction for the RSA cellular licenses on June 4, 2002. Ranger did not participate.

## II. Analysis

On appeal Ranger argues first that the Commission's interpretation of § 309(*l*) conflicts with the plain meaning of, and in any event, is not a reasonable reading of, the statute. Second, the petitioner maintains the Commission could not, consistent with precedent specifying the relevant equitable considerations, conclude that the public interest favored opening the auction to new applicants. Finally, the petitioner contends the Commission opened the auction unlawfully in order to maximize federal revenues.

We consider Ranger's first argument under the familiar two-step analysis of *Chevron U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). First we determine "whether Congress has directly spoken to the precise question at issue;" if the Congress has so spoken, then "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If, however, "the statute is silent or ambiguous with respect to the specific issue," then we go on to determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. With respect to Ranger's other two arguments, our review is limited to determining whether the *Order* is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### A. Section 309(*l*)

Section 309(*l*) required the Commission, with respect to pending comparative license cases involving applications "for commercial radio or television stations," to limit the pool of applicants to those who had filed "competing applications for initial licenses or construction permits" before July 1, 1997. The Commission determined that a cellular telephone license is not a license for a "commercial radio or television station"

because the quoted phrase denotes only broadcast stations. *Order*, 17 FCC Rcd. ¶ 17.

Ranger offers several non-frivolous arguments that § 309(*l*) must be read to apply to licenses to provide cellular telephone service. First, Ranger notes that cellular service is regulated as a "commercial mobile radio service," 47 C.F.R. § 20.9(a), which seems to place it neatly within the more general class of "commercial radio and television stations" referenced in § 309(*l*). Relatedly, according to Ranger, when the Congress wanted to refer only to a broadcast station, it said either "broadcast station" or "broadcasting station." *See, e.g.,* 47 U.S.C. §§ 307(c), 311(c)(1), 315. Second, Ranger argues that the inclusion of the phrase "initial licenses or construction permits" in § 309(*l*) indicates the Congress intended to cover more than just broadcast stations because the Commission issues a "construction permit" only for a broadcast station, whereas an "initial license" is issued for a common carrier radio or a commercial mobile radio service. Therefore, the argument goes, the Commission's reading renders the phrase "initial license" superfluous. Ranger also points out that the Commission has sometimes referred to commercial mobile radio service as "commercial radio." *See, e.g., In re Application of 360 Degrees Communications Company*, 14 FCC Rcd. 2005 (1998). Finally, Ranger argues that we should disregard the legislative history of § 309(*l*) because it contravenes the plain meaning of the statute–which, of course, we would do if the meaning of the statute is plain on its face. *See Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear").

Although not without force, Ranger's arguments do not demonstrate that § 309(*l*) simply must be read as applying to cellular telephone licenses. First, the phrase "commercial radio and television stations" is not defined, nor is it used, in the 1997 Act outside the provision adding § 309(*l*) to the Communications Act. The Commission points out that the phrase "commercial radio" had been used, however, in both the Communications Act and the regulations promulgated thereunder, to mean only broadcast radio. *See, e.g.,* 47

U.S.C. § 158(g), 47 C.F.R. §§ 73.3526(e)(14), 73.3555(c)(2). The Commission then makes the point that the conjunction of "television stations," which are unquestionably engaged in broadcasting, with "commercial radio" in the same phrase suggests the Congress meant to cover only broadcast media, and thereby casts serious doubt upon the interpretation advanced by Ranger.

Furthermore, the heading of § 309(*l*) strongly favors the Commission's view that it does not apply to cellular telephone service. The heading – which was part of the 1997 Act, not a later addition by the Reviser – refers to "pending comparative licensing cases." This implies that the provision is inapplicable to cellular telephone services, licenses for which have not been the subject of comparative hearings since at least 1986. On the other hand, as of 1997 broadcast licenses had for more than 50 years been awarded through comparative hearings. The reference to comparative licensing in § 309(*l*) therefore implies the Congress meant to apply that section only to broadcast stations.

Hence we turn to the legislative history of § 309(*l*), which, although of distinctly lesser weight than an argument from the text of the 1997 Act, also supports the reading that limits § 309(*l*) to broadcast licenses. The Committee Report describes § 309(*l*) specifically as applying to "any mutually exclusive applications for radio or television *broadcast* licenses," not to the broader category of licenses for all radio and television stations. H.R. Conf. Rep. No. 217 at 573 (emphasis added). The use of the modifier "broadcast" in the report clearly implies that the Congress intended to limit the scope of § 309(*l*) to broadcast licenses.

We are led to conclude that the Congress has not directly spoken to the question whether § 309(*l*) covers only broadcast stations; the statute simply is not unambiguous on that score. We must go on to determine, therefore, whether the Commission has offered a reasonable interpretation of § 309(*l*).

From the foregoing discussion of the parties' positions, it is obvious that, for the same reasons the Commission's argu-

ments cast doubt upon the clarity of § 309(*l* ), the agency offers a reasonable interpretation of the statute. Not surprisingly, therefore, Ranger proffers no reason to reject the Commission's interpretation apart from the reasons for which it argued the meaning of the statute is plainly otherwise. Again, the Commission has shown that § 309(*l* ), viewed in the context of the 1997 Act, supports a reading that covers only broadcast stations. Although this reading is not the only possible interpretation of § 309(*l* ), it is certainly a reasonable one and therefore commands our deference.

## B. Public Interest

Ranger contends the Commission neither followed nor distinguished its precedents for determining whether to open a pending applicant pool to newcomers, *citing Competitive Bidding in the Broadcast Services*, 13 FCC Rcd. 15920 (1998); and *Filing Procedures in the MDS and ITFS Services*, 10 FCC Rcd. 9589 (1995) (*MDS Order*). According to the petitioner, the Commission failed to take account of the ordinary equitable considerations applicable to this issue, namely, the length of time the original applications had been pending (13 to 14 years), the number of original applicants (3), the potential for delay occasioned by opening the filing window, and whether the licenses to be auctioned were identical to those for which the original applications were filed (which they were). *See, e.g., MDS Order*, 10 FCC Rcd. ¶¶ 87–95. Ranger maintains that consideration of these factors leads inexorably to the conclusion that the Commission should not have accepted new applications.

We think the Commission reasonably applied appropriate factors to the circumstances of this case. The Commission first opined that open eligibility "generally favor[s]" the public interest because "maximizing the pool of auction applicants helps to ensure that licenses are awarded to entities that value them most highly and are, therefore, most likely to offer prompt service to the public." *Order*, 17 FCC Rcd. ¶ 10. Opening the pool would be particularly useful in this case because otherwise there would be only three eligible bidders. *Id.* ¶ 19. Another "important factor in [the Com-

mission's] decision" was that the licenses covered rural areas, for which the Commission has a special responsibility under § 309(j)(4)(B) to promote the rapid development of service. *Id.* ¶ 14. And, the Commission added, the IOA licensees "may have a substantial interest in bidding for permanent authorizations in markets where they have been providing interim cellular service," *id.* ¶ 15.

The Commission has also properly distinguished its precedents. The *MDS Order*, the Commission noted, addresses not issues of eligibility, *see Order*, 17 FCC Rcd. ¶ 18 n.61, but whether to hold an auction or to conduct a lottery for the licenses there in question. *MDS Order*, 10 FCC Rcd. ¶ 88. In addition, the Commission explained that the concern expressed in *Competitive Bidding in the Broadcast Services* – that reopening the filing window would not "expedite . . . the commencement of service to the public," 13 FCC Rcd. ¶ 108 – did not obtain in this case because customers in the RSAs were already receiving cellular telephone service from the IOA licensees. *See Order*, 17 FCC Rcd. ¶ 9 n.29. We conclude the Commission considered the relevant factors and did not act in an arbitrary and capricious manner in applying the public interest standard.

C. Revenue Enhancement

Finally, Ranger argues the Commission violated 47 U.S.C. § 309(j)(7)(B), which provides that "in prescribing regulations pursuant to Paragraph 4(A) of this subsection, the Commission may not base a finding of public interest, convenience and necessity solely or predominantly on the expectation of Federal revenues from the use of a system of competitive bidding under this subsection." Specifically, Ranger contends the Commission opened the bidding to newcomers "solely or predominantly" for the purpose of enhancing what the licenses would fetch.

The Commission argues first that § 309(j)(7)(B) "applies only in specifically-enumerated circumstances, of which determining eligibility to participate in an auction does not appear to be one." The Commission maintains that, on the contrary, it "is charged with assigning spectrum to the party that

places the highest value on the use of the spectrum, because that party is presumed to be most likely to use the licenses efficiently."

The Commission clearly has the better of the argument here: Section 309(j)(7)(B) simply does not apply to this case. It applies only to regulations concerning "alternative payment schedules and methods of calculation" to be used in specifying the methodology of competitive bidding. So far as § 309(j)(7)(B) is concerned, therefore, the Commission is free to consider revenue enhancement when determining whether to expand the pool of eligible bidders.

Unfortunately, the Commission did not notice that § 309(j)(7)(B) was inapplicable to this proceeding until briefing the matter to this court. In the *Order* itself the Commission instead explained why it was in compliance with that provision. We do not ordinarily consider an argument made for the first time on review. *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal"). In this case, however, we have no qualms about doing so: The statute is clearly inapplicable. Indeed, Ranger does not suggest otherwise, resting instead upon the Commission's tardiness in raising the point.

We would be tilting at a non-existent windmill were we to consider whether the Commission has complied with an inapplicable statute. *Cf. United States Nat'l Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 447 (1993) ("a court may consider an issue antecedent to . . . and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief") (internal quotation marks omitted); *Hormel v. Helvering*, 312 U.S. 552, 557 (1941) ("There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court or administrative agency below"). Surely, even if it has not complied, we would not, knowing that the statute

is inapplicable, require the Commission to close the auction to newcomers; to do so would thwart the clearly stated will of the Congress because of a temporary oversight by the Commission.

### III.   Conclusion

We conclude that the Commission offered a reasonable interpretation of an ambiguous statute, justified its decision under the public interest standard, and was not subject to 47 U.S.C. § 309(j)(7)(B).   For those reasons the petition for review is

*Denied.*