NATIONAL HOME EQUITY MORT-
GAGE ASSOCIATION, Plaintiff,

v.

OFFICE OF THRIFT SUPERVISION,
et al. Defendants.

No. CIV.A. 02–2506(GK).

United States District Court,
District of Columbia.

July 14, 2003.

Philip A. Lehman, Attorney General State of North Carolina, Raleigh, NC, for Attorney General of the States.

Elizabeth R. Moore, Washington, DC, Thomas Jacob Segal, Office of Thrift Supervision.

Adam Craig Paul, Kirkpatrick & Lockhart, LLP, Washington, DC, for Defendant.

Ronald W. Stevens, Kirkpatrick & Lockhart LLP, Washington, DC, for National Home Equity Mortgage Association.

### *MEMORANDUM OPINION*

KESSLER, District Judge.

Plaintiff, National Home Equity Mortgage Association ("NHEMA"), brings this action under the Administrative Procedure Act, 5 U.S.C. § 706. Plaintiff challenges amendments to 12 C.F.R. § 560.220, which the Office of Thrift Supervision ("OTS") adopted and published as a final rule on September 26, 2002 ("Amended Rule"). 67 Fed.Reg. 60542 (Sept. 26, 2002). Defendants are OTS and its Director, James Gilleran. On March 31, 2003, the Court granted the Motion of Amici Curiae the National Community Reinvestment Coali-

tion, *et al.* ( collectively "National Community Reinvestment Coalition")[1] to file an Amicus Brief. On April 4, 2003, the Court granted the Motion of Amici Curiae the State Attorneys General[2] to file an Amicus Brief.

This matter is now before the Court on Plaintiff's Motion for Summary Judgment, Defendants' Motion for Summary Judgment, the Brief Amicus Curiae of the National Community Reinvestment Coalition in Support of Defendants' Motion for Summary Judgment, and the Brief Amicus Curiae of the State Attorneys General in Support of Defendants' Motion for Summary Judgment. Upon consideration of the Motions, Oppositions, Replies, the administrative record, and the entire record herein, for the reasons stated below, Defendants' Motion for Summary Judgment is **granted** and Plaintiff's Motion for Summary Judgment is **denied.**

### I. BACKGROUND

NHEMA is a national trade association whose members include state-chartered housing creditors ("state housing creditor" or "SHC") other than commercial banks and credit unions. Plaintiff challenges the Amended Rule,[3] which designates certain OTS regulations as applicable to SHCs engaging in alternative mortgage transactions ("AMTs"),[4] such as Plaintiff's members, under the Alternative Mortgage

1. Amici are National Community Reinvestment Coalition, Center for Responsible Lending, National Consumer Law Center, AARP, National Association of Consumer Advocates, ACORN, Consumers Union, and the U.S. Public Interest Research Group. The organizations focus on a range of consumer protection issues through litigation, policy research, and advocacy.

2. Amici are the Attorneys General of the following states: Alaska, Arizona, Delaware, Florida, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey,

New York, North Carolina, Ohio, Oregon, South Carolina, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

3. On September 26, 2002, OTS announced that the Amended Rule would become effective on January 1, 2003. On December 12, 2002, OTS postponed its effective date from January 1, 2003 to July 1, 2003.

4. AMTs are loans other than traditional fixed-term, fixed-rate loans. An adjustable rate mortgage is one example of an AMT.

Transaction Parity Act, 12 U.S.C. §§ 3801 *et seq.* ("AMTPA" or "Parity Act").

In designating federal regulations that are applicable to SHCs, OTS also determined that two regulations previously applicable to SHCs——those governing prepayment penalties, 12 C.F.R. § 560.33, and late fees, 12 C.F.R. § 560.34——are no longer applicable to SHCs. As a result, Plaintiff must comply with states' regulations governing these items, rather than the relevant OTS regulations.

In its Complaint, filed on December 20, 2002, NHEMA challenges the OTS determinations. Plaintiff alleges that AMTPA preempts all state laws governing AMTs, and that OTS does not have the authority to determine what state laws are or are not preempted by federal law.

## II. STATUTORY FRAMEWORK

Congress enacted AMTPA in 1982, after finding that "increasingly volatile and dynamic changes in interest rates" had "seriously impaired the ability of housing creditors to provide consumers with fixed-term, fixed-rate credit secured by interests in real property...." 12 U.S.C. § 3801(a)(1); Pub.L. 97–320 § 802 (Oct. 15, 1982). Congress concluded that the availability of loans other than traditional fixed-rate, fixed-term transactions was "essential to the provision of an adequate supply of credit secured by residential property." 12 U.S.C. § 3801(a)(2).

Because federally chartered depository institutions had already been authorized to engage in such alternative mortgage financing, *id.* § 3801(a)(3), Congress enacted the Parity Act to

eliminate the discriminatory impact that those regulations have upon nonfederally chartered housing creditors and provide them with parity with federally chartered institutions by authorizing all housing creditors to make, purchase, and enforce alternative mortgage trans-

actions so long as the transactions are in conformity with the regulations issued by the Federal agencies [*i.e.*, OTS].

*Id.* § 3801(b). To that end, AMTPA provides that "[a]n alternative mortgage transaction may be made by a housing creditor in accordance with this section notwithstanding any State constitution, law, or regulation." *Id.* § 3803(c).

The Parity Act further authorizes OTS, and other federal agencies, to "identify, describe, and publish those portions or provisions of their respective regulations that are inappropriate for (and thus inapplicable to), or that need to be conformed for the use of, nonfederally chartered housing creditors." Pub.L. 97–320 § 807(b) ("Section 807(b)").

OTS' amendment of 12 C.F.R. § 560.222 and concurrent determination that federal rules governing prepayment penalties and late fees are not applicable to SHCs, was made pursuant to its authority under Section 807(b). Specifically, OTS concluded that these regulations are not applicable to SHCs because they are neither "essential [n]or intrinsic" to SHCs' ability to offer AMTs. *See* Amended Rule, 67 Fed.Reg. at 60544.

## III. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Under the Administrative Procedure Act, an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). In making this determination, the Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). If the "agency's reasons and policy choices ... conform to 'certain minimal standards of rationality' ... the rule is reasonable and must be upheld," *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 521 (D.C.Cir.1983) (citation omitted), even though the Court itself might have made different choices.

■ Under arbitrary and capricious review, the Court does not undertake its own fact-finding. Instead, the Court must review the administrative record assembled by the agency to determine whether its decision was supported by a rational basis. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

## IV. ANALYSIS

As noted above, NHEMA contends that OTS adopted the Amended Rule without authority to do so, and that the Amended Rule is arbitrary, capricious, and "otherwise not in accordance with law," in violation of the APA. 5 U.S.C. § 706(2)(A). First, Plaintiff argues that the Parity Act expressly defines the scope of preemption. Second, Plaintiff contends that, even if the Parity Act is ambiguous, OTS' interpretation, in the Amended Rule, that AMTPA and Section 807(b) authorize it to determine what regulations are "essential or intrinsic" to SHCs' ability to offer AMTs, is not entitled to deference. *See* Amended Rule, 67 Fed.Reg. at 60544. Such deference is not warranted, according to Plaintiff, because: (a) Section 807(b) is not a grant of rulemaking authority under the Parity Act; (b) OTS is not the only agency with delegated authority to interpret the

Parity Act; and (c) OTS' interpretation of the Parity Act has been inconsistent. Third, Plaintiff maintains that, even if OTS did have authority to determine what rules are essential or intrinsic, the Amended Rule is arbitrary and capricious because there is no evidence in the administrative record demonstrating that late payment and prepayment fees are not essential or intrinsic to SHCs' ability to provide AMTs. Finally, Plaintiff contends that the Amended Rule is arbitrary and capricious because there is no evidence in the administrative record to support OTS' allegation that SHCs are abusing late payment and prepayment fees.

### A. AMTPA Does Not Expressly Preempt All State Laws Governing AMTs Made by SHCs

Plaintiff's principal argument is that OTS does not have the authority to limit the extent to which AMTPA preempts state laws because, in enacting the Parity Act, Congress expressly preempted all state laws governing AMTs. Defendants maintain that Congress did not preempt all such state laws, but instead preempted only those regulations that authorize, not those that govern, alternative mortgage transactions.

In *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court announced a two-part test for determining whether an agency's interpretation of a statute is entitled to deference. First, the reviewing court inquires whether the plain language of the statute addresses the precise issue. *Id.; Ranger Cellular v. FCC,* 333 F.3d 255, 2003 WL 21495159, at *3 (D.C.Cir. July 1, 2003); *Cellular Telecommunications & Internet Ass'n v. FCC,* 330 F.3d 502, 507 (D.C.Cir.2003). If so, the courts as well as the agency must give effect to the unam-

biguously expressed intent of Congress. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *Ranger Cellular*, 333 F.3d 255, at 257–58; *Cellular Telecommunications*, 330 F.3d at 507.

If, however, the statute is unclear, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778; *Ranger Cellular*, 333 F.3d 255, at 257–58; *Cellular Telecommunications*, 330 F.3d at 507. In answering that question, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778; *Ranger Cellular*, 333 F.3d 255, at 257–58; *Cellular Telecommunications*, 330 F.3d at 507. The rationale for this deference is that the agency's decision as to the meaning of the statute involves "reconciling conflicting policies and a full understanding of the force of the statutory policy ... [and] depend[s] upon more than ordinary knowledge respecting the matters subjected to agency regulations." *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778; *Ranger Cellular*, 333 F.3d 255, at 257–58; *Cellular Telecommunications*, 330 F.3d at 507. In short, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778; *Ranger Cellular*, 333 F.3d 255, at 257–58; *Cellular Telecommunications*, 330 F.3d at 507.

### 1. Plain Language of AMTPA

#### a. Sections 3801 and 3803

Under the first step of the *Chevron* analysis, the text of the Parity Act does not clearly establish the scope of the Act's preemption.[5] Subsections (a)(3) and (b) of Section 3801 suggest that Congress intended to preempt regulations authorizing AMTs, not all regulations governing AMTs. These subsections indicate that the parity Congress sought to achieve between state and federal lenders is the ability to engage in AMTs.

Specifically, as noted above, AMTPA's "Findings and Purpose" section indicates that the statute was enacted in response to the inability "of housing creditors to provide consumers with fixed-term, fixed-rate credit secured by interests in real property." 12 U.S.C. § 3801(a)(1). Congress recognized that AMTs "are essential to the provision of an adequate supply of credit secured by residential property," and that federal agencies, such as OTS, had already "adopted regulations authorizing federally chartered depository institutions to engage in alternative mortgage financing." *Id.* § 3801(a)(2), (3).

Accordingly, the purpose of the Parity Act was to

> eliminate the discriminatory impact that *those regulations* have upon nonfederally chartered housing creditors and provide them with parity with federally chartered institutions by authorizing all housing creditors to make, purchase, and enforce alternative mortgage transactions so long as the transactions are in conformity with the regulations issued by the Federal agencies.

*Id.* § 3801(b) (emphasis added). Congress' use of the term "those regulations" following its emphasis on regulations "authorizing" federal institutions to engage in AMTs, strongly suggests that the parity it sought would be achieved when both feder-

---

**5.** Neither does AMTPA's legislative history establish the scope of preemption. Indeed, the limited legislative history merely restates the ambiguous purpose and authority outlined in the text of the statute. *See* Sen. Rep. 97–463 (May 28, 1982); Sen. Rep. 97–641 (Sept. 8, 1982); H. Rep. 97–899 (Sept. 30, 1982).

al and state institutions were authorized to engage in AMTs.

Despite this language emphasizing regulations that authorize AMTs, the text of the Parity Act also suggests that the scope of preemption may be broader than regulations that merely authorize AMTs. Section 3803(a)(3) provides that SHCs may "make, purchase, and enforce alternative mortgage transactions, except that this section shall apply ... only to transactions made in accordance with regulations governing alternative mortgage transactions as issued by [OTS] for federally chartered savings and loan associations." *Id.* § 3803(a)(3).

Relying on Congress' use of the word "governing," Plaintiff argues that the Parity Act expressly preempts all state laws governing AMTs. However, under *Chevron* step one, the plain language of AMTPA does not clearly and directly address the issue, and Plaintiff's interpretation is not expressly required by the text of the Act. As discussed above, Subsections (a)(3) and (b) of Section 3801 strongly suggest that Congress intended AMTPA to preempt only those regulations authorizing AMTs. Thus, while Plaintiff's interpretation may be one reasonable interpretation of the Parity Act, it is not expressly required by the plain language of the Act, nor is it the only reasonable interpretation of AMTPA's terms.

Further, Plaintiff's argument that AMTPA preempts all regulations governing AMTs proves too much. Plaintiff contends that regulations "govern a transaction if they dictate or limit the terms or conditions of the transaction." Pl. Mot. Summ. J. at 21. If all such federal regulations were applicable to SHCs, then SHCs would not have to comply with *any* state

consumer protection laws that "dictate or limit the terms or conditions" of AMTs, not just with those that regulate the prepayment penalty and late fee provisions at issue here. While federal institutions are certainly not subject to state consumer protection laws, they are subject to extensive federal regulation by OTS, including examination, supervision, and enforcement regulations designed to "ensure safety and soundness." Def. Reply Memo. at 7.

Congress explicitly provided that SHCs are not "under the supervision of the federal agencies." Sen. Rep. 97–463, at 55 (May 28, 1982). As a result, under Plaintiff's interpretation of AMTPA, SHCs would receive the benefit of complete federal preemption. Not only would they not be subject to the regulation and supervision to which federal institutions are subject, but they would also not be subject to state consumer protection laws. Thus, contrary to Plaintiff's contention that the Parity Act was intended to achieve competitive equality between federal and state institutions, Plaintiff's interpretation of AMTPA would provide a substantial advantage to state housing creditors by freeing them from either federal or state supervision.[6]

### b. Section 807(b)

Plaintiff further argues that Section 807(b) does not permit OTS to determine what regulations are preempted, but instead only gives OTS the limited role of addressing a practical problem associated with implementing AMTPA. Specifically, NHEMA contends that Section 807(b) authorizes OTS to identify only those regulations that, as a result of the regulatory framework governing federal institutions,

---

**6.** Moreover, the result of Plaintiff's interpretation of AMTPA is that the statute enacted to protect consumers—by ensuring that they have adequate "credit secured by interests in real property," 12 U.S.C. § 3801(a)(1)— would serve to disadvantage consumers by failing to adequately regulate and supervise SHCs.

"could not logically be applied to state housing creditors." Pl. Mot. Summ. J. at 26.

NHEMA's argument rests on the assumption that Congress expressly defined the scope of preemption in the Parity Act, and that it did not authorize OTS to make that determination. However, as addressed above, neither the plain language of AMTPA nor its legislative history establish that Congress expressly preempted all state laws governing AMTs.

Further, while Section 807(b) certainly permits OTS to identify regulations that could not logically be applied to SHCs, there is nothing in the statute or its legislative history indicating that those are the only regulations OTS has the authority to identify. Instead, AMTPA provides that OTS shall identify regulations that are "inappropriate for (and thus inapplicable to)" SHCs. Pub.L. 97–320 § 807(b). The statute does not define what regulations would be inappropriate, and it certainly does not expressly limit OTS to identifying only those regulations that are incompatible with SHCs because they involve the federal regulatory framework.

In sum, under *Chevron* step one, the plain language of AMTPA does not expressly preempt all state laws governing AMTs, and the scope of the Act's preemption is ambiguous.

## 2. Case Law

Indeed, case law supports the conclusion that the Parity Act itself does not define the scope of preemption. In *Black v. Financial Freedom Senior Funding Corp.*, 92 Cal.App.4th 917, 112 Cal.Rptr.2d 445 (2001), the court concluded that the Parity Act does not preempt all state laws concerning AMTs. Instead, the court determined that AMTPA preempts only those regulations identified by OTS pursuant to Section 807(b). In doing so, the court rejected the respondents' contention, much like NHEMA's argument here, that the purpose of AMTPA was to achieve "absolute parity" between SHCs and federal institutions. *Id.* at 457.

Further, courts evaluating OTS' regulations prior to the Amended Rule at issue here, have deferred to OTS' interpretation of the scope of AMTPA's preemption, thereby indicating that the statute itself does not define the scope of preemption. *See Shinn v. Encore Mortgage Servs. Inc.*, 96 F.Supp.2d 419, 423 (D.N.J.2000) ("OTS has clearly expressed its intent to preempt state laws which limit state creditors' ability to charge prepayment penalties in connection with AMTs"); *National Home Equity Mortgage Ass'n. v. Face*, 64 F.Supp.2d 584, 590 (E.D.Va.1999), *aff'd*, 239 F.3d 633 (4th Cir.2001) ("preemption of state laws limiting prepayment penalties is a decision Congress intended to be left to the OTS").[7]

---

**7.** The *Face* and *Shinn* courts evaluated OTS' 1996 Rule, discussed *infra*, which concluded that the prepayment penalty and late fees regulations at issue here, were applicable to SHCs.

The cases NHEMA relies on do not support its contention that AMTPA preempts all state laws governing AMTs. Neither *Face*, 239 F.3d 633, nor *Illinois Ass'n of Mortgage Brokers v. Office of Banks & Real Estate*, 308 F.3d 762 (7th Cir.2002), determined that regulations OTS designates as inapplicable to SHCs un-

der Section 807(b), would nonetheless preempt state laws as a result of the broad preemption mandated by AMTPA. In *Face*, OTS had designated prepayment penalties as applicable to SHCs, and the state could not apply its law proscribing such penalties. 239 F.3d 633. In *Illinois Ass'n*, the court explicitly declined to determine whether the scope of preemption under AMTPA was limited to those regulations identified by OTS under Section 807(b).

Finally, the Supreme Court has cautioned that "where federal law is said to bar state action in fields of traditional state regulation, ... we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *California Div. of Labor Standards Enforcement v. Dillingham Constr., Inc.,* 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). The regulation of real property transactions at issue here is a field of activity traditionally regulated by the states. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).

■ Because neither the text of the Parity Act nor its legislative history expressly indicates that preemption was the "clear and manifest" purpose of Congress, the prepayment penalty and late fee charges at issue here are not preempted by the Parity Act.

**B. OTS' Interpretation of AMTPA is Entitled to Deference**

■ Under *Chevron* step one, the scope of preemption under AMTPA is ambiguous, and Congress did not clearly express its intent for AMTPA to preempt all state laws governing AMTs. Accordingly, the Court turns to the second *Chevron* step— which requires deference to the agency's interpretation if it is a permissible construction of the statute.

Here, OTS interprets AMTPA as requiring it to identify those regulations that "authorize" federal thrifts to "engage in" AMTs, and are therefore preempted by the statute. In the Amended Rule, OTS described the regulations authorizing AMTs as those that are "essential or intrinsic to the ability of state housing credi-

tors to continue to provide alternative mortgage transactions." *See* AR 50529.

Because this interpretation of AMTPA is a permissible construction of the statute, the Court defers to OTS' interpretation. As addressed above, subsections (a)(3) and (b) of Section 3801 suggest that, in enacting AMTPA, Congress intended to preempt regulations authorizing AMTs, and that the parity it sought to achieve between state and federal lenders is the ability to engage in AMTs, not competitive equality. Accordingly, the text of AMTPA clearly permits OTS to conclude that the Act requires it to identify only those regulations authorizing AMTs, and to define such regulations as those that are "essential or intrinsic" to SHCs' ability to provide AMTs. Since OTS' interpretation is permissible under the statute, it is entitled to deference.

Plaintiff maintains that OTS' interpretation of AMTPA is not entitled to *Chevron* deference because: (1) Congress did not delegate rulemaking authority to OTS; (2) more than one agency has authority to interpret AMTPA; and (3) OTS' interpretation of AMTPA has been inconsistent.

**1. OTS' Rulemaking Authority**

■ Plaintiff argues that OTS' interpretation is not entitled to deference because, by enacting Section 807(b), Congress did not delegate rulemaking authority to OTS.

Plaintiff's argument is predicated on the assumptions that Congress expressly defined the scope of AMTPA's preemption in the Act itself; that Section 807(b) does not authorize OTS to determine the scope of preemption; and that Section 807(b) gives OTS the limited role of identifying only those regulations that, as a result of the regulatory framework governing federal institutions, could not logically be applied to state housing creditors. As addressed

above, however, the text of AMTPA does not require this conclusion.

Instead, in Section 807(b), Congress expressly authorized OTS to "identify, describe, and publish those portions or provisions of their respective regulations that are inappropriate for (and thus inapplicable to) . . . nonfederally chartered housing creditors." Pub.L. 97–320 § 807(b). Because Congress did not define the terms "inappropriate for" and "inapplicable to," it delegated to OTS broad authority to determine the federal regulations applicable to SHCs. *See Shinn*, 96 F.Supp.2d at 423–24 (concluding that, under AMTPA, Congress delegated broad rulemaking authority to OTS); *Face*, 64 F.Supp.2d at 588–89 (same).

### 2. Multiple Agencies' Authority to Interpret AMTPA

■ Plaintiff further argues that, even if Congress delegated rulemaking authority to OTS, its interpretation of AMTPA is not entitled to *Chevron* deference because two other agencies—the Office of the Comptroller of the Currency ("OCC") and the National Credit Union Administration ("NCUA")—have the same authority to interpret AMTPA as OTS.

However, Plaintiff's argument stretches the existing case law. The principal line of cases relied on by NHEMA stands for the proposition that *Chevron* deference does not apply to interpretations of statutes of general applicability, such as the Rehabilitation Act, 29 U.S.C. § 701, or Privacy Act, 5 U.S.C. § 552, which are administered by multiple agencies. In those cases, however, none of the agencies had particular expertise in handling the substance of the statutes. As a result, the policy basis underlying *Chevron* deference—namely, deference to the agency's particular expertise—had not been satisfied. *See Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 642 n. 30, 106 S.Ct. 2101, 90 L.Ed.2d 584 (no

deference to one agency's interpretation of Rehabilitation Act); *Proffitt v. FDIC*, 200 F.3d 855, 860 (D.C.Cir.2000) (no deference to agency interpretation of statute of limitations); *Benavides v. U.S. Bureau of Prisons*, 995 F.2d 269, 272 n. 2 (D.C.Cir. 1993) (no deference to agency interpretation of Privacy Act).

Plaintiff's reliance on *Salleh v. Christopher*, 85 F.3d 689, 691–92 (D.C.Cir.1996), is similarly unavailing. In *Salleh*, the D.C. Circuit held that *Chevron* deference did not apply to only one agency's interpretation of a statute administered by multiple agencies. In that case, two agencies had interpreted a statute in conflicting ways. That conflict between multiple agencies' interpretation of a statute, which the *Salleh* Court avoided by declining to defer to the agency's respective interpretations, is not present in this case.

Here, while Section 807(b) authorizes OTS, OCC, and NCUA to identify regulations that are inappropriate for nonfederally chartered housing creditors, each of those agencies is limited to identifying regulations that apply only to their respective institutions. In particular, while OCC identifies regulations for state-commercial banks, and NCUA does so for state-chartered credit unions, OTS identifies regulations for all other state-chartered housing creditors. In other words, the three agencies do not identify regulations that apply to the same institutions, and the conflicting interpretations present in *Salleh* do not exist here.

Indeed, in *Trans Union LLC v. FTC*, the D.C. Circuit accorded *Chevron* deference to the Federal Trade Commission's definition of terms in a statute administered by several federal agencies, including OTS. *See Trans Union LLC v. FTC*, 295 F.3d 42, 50–51 (D.C.Cir.2002). As addressed above, other courts have also deferred to OTS' interpretation of AMTPA.

*See Black,* 112 Cal.Rptr.2d at 458; *Face,* 64 F.Supp.2d at 589.

### 3. OTS' Prior Interpretation of AMT-PA

Finally, Plaintiff argues that OTS is not entitled to *Chevron* deference because its interpretation of AMTPA has been inconsistent.

■ First, in *Chevron* itself, the Supreme Court deferred to the agency's statutory interpretation despite the fact that the agency had changed its interpretation. *Chevron,* 467 U.S. at 863, 104 S.Ct. 2778. The Court reasoned that

> The fact that the agency has from time to time changed its interpretation of the term "source" does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.

*Id.* at 863–64. Accordingly, a change in OTS' interpretation of the Parity Act does not undermine the *Chevron* deference this Court must afford OTS' Amended Rule.

Second, while OTS' interpretation of AMTPA temporarily changed in 1996, OTS' current interpretation is consistent with its interpretation of the Parity Act from 1982 through 1996. Specifically, until 1996, OTS interpreted its duties under AMTPA as requiring it to identify regulations authorizing SHCs to engage in AMTs, not those governing AMTs.

OTS' predecessor, the Bank Board, issued its first Notice interpreting AMTPA in November 1982. 47 Fed.Reg. 51732 (Nov. 17, 1982). In that Notice, the Bank Board identified as applicable to SHCs those "regulations authorizing alternative mortgage transactions and the limitations applicable to those transactions." *Id.* at 51734. The Board stated that "[o]ther regulations designed to ensure safety and soundness in residential real estate lending by federal associations in general have not been identified, and on these matters housing creditors should refer to otherwise applicable state law." *Id.*

In May 1983, the Bank Board promulgated a second Notice. 48 Fed.Reg. 23032 (May 23, 1983). In that Notice, the Board again identified only those regulations that are "an integral part of, and particular to, alternative mortgage transactions," concluding that it should not identify those regulations that "apply generally to mortgage loans." *Id.* at 23053. The prepayment penalty and late fee regulations at issue here were deemed inapplicable and were not identified by OTS.

It was not until 1996, that OTS diverged from its original interpretation of AMTPA, concluding for the first time that its regulations on prepayment and late fees were applicable to SHCs. Accordingly, the Amended Rule is not as dramatic a shift in OTS' interpretation as Plaintiff suggests. Instead, the Amended Rule merely returns to OTS' original interpretation of AMTPA, which it followed for fourteen years.

In sum, because OTS' identification of regulations that are "essential or intrinsic to the ability of state housing creditors to continue to provide alternative mortgage transactions" is a permissible interpretation of AMTPA, the Court affords OTS *Chevron* deference.

### C. OTS' Conclusion that Prepayment Penalties and Late Fees Are Not "Essential or Intrinsic" to SHC's Ability to Provide AMTs Is Not Arbitrary or Capricious

■ Plaintiff next argues that, even if OTS does have authority to identify only those regulations that are "essential or

intrinsic" to SHCs' ability to engage in AMTs, the Amended Rule is nonetheless arbitrary and capricious because there is no evidence in the administrative record demonstrating that prepayment penalties and late fees are not essential or intrinsic to AMTs.

■ As noted above, under APA review, the Court must give great weight and substantial deference to the agency's findings, and the Court may not substitute its judgment for that of the agency. Even greater deference must be accorded here because OTS has made a predictive judgment within the field of its expertise. *See Baltimore Gas & Electric Co. v. NRDC,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

In the Amended Rule, OTS concluded that prepayment penalty and late fee restrictions are not essential or intrinsic to the ability to offer AMTs, and therefore did not identify them in the Rule as applicable to SHCs. In doing so, OTS concluded that these restrictions "apply to real estate lending in general," and are not peculiar to AMTs. AR 50529. Because OTS determined that prepayment and late fee provisions are common to traditional mortgages, it determined there was no reason to distinguish those provisions from other general lending rules which are not identified as applicable to SHCs.

The administrative record contains ample evidence supporting OTS' conclusion. In particular, OTS relied on evidence that, during the fourteen years SHCs were not permitted to comply with federal prepayment and late fee rules, SHCs' share of the one-to-four-family residential market nearly doubled, increasing from 28.9 percent in 1982 to 56.8 percent in 1996. During this same period, the share of this market held by commercial banks and thrifts dropped from 66 percent to 42.5 percent. Thus, the evidence in the administrative record demonstrates that, despite

their inability to comply with federal prepayment and late fee rules, SHCs thrived between 1982 and 1996.

It is true that the administrative record does not contain information on SHCs' relative market share in the AMT market from 1982 to 1996. However, it was reasonable for OTS to conclude that SHCs' level of participation in the AMT market increased substantially after AMTPA was enacted in 1982. When Congress enacted AMTPA, "many states had laws which prevented state-chartered housing creditors from making AMTs," AR 40069, and AMTPA was enacted to ensure that SHCs were permitted to offer AMTs.

In sum, OTS' determination that prepayment penalty and late fee provisions are not essential or intrinsic to SHCs' ability to provide AMTs is rational and reasoned. The Court defers to OTS' conclusion that these provisions apply to real estate lending in general. Further, while the evidence relied on by OTS does not definitively establish that SHCs' market share in the AMT market increased between 1982 and 1996, SHCs' increased ability to engage in AMTs after 1982, combined with their substantial growth in the residential market generally, indicate that OTS' conclusion was reasonable, and not arbitrary or capricious.

**D. OTS' Conclusion that Prepayment Penalties and Late Fees May Be Subject to Abuse Is Not Arbitrary or Capricious**

■ Finally, Plaintiff contends that the Amended Rule is arbitrary and capricious because there is no evidence in the administrative record to support OTS' allegation that SHCs are abusing prepayment penalties and late fees. Plaintiff is incorrect.

First, the administrative record shows a substantial increase in the inclusion of pre-

payment penalty provisions in subprime[8] AMTs following the change in OTS' regulation in 1996. AR 40322–24, 40634–35, 40697, 40703,50016, 50110, 50532.

Second, the record also contains evidence that prepayment penalties and late fees may be subject to abuse, particularly for consumers with subprime loans. For instance, there is evidence in the record that "[t]he high cost nature of these loans has resulted in burdensome monthly payments that consume more than reasonable portions of borrower income." AR 40323. Prepayment penalties can "inflict severe costs by trapping borrowers in mortgages with interest rates above what is appropriate for their risk by preventing them financially from refinancing." *Id.* at 40759. A letter in the record from 46 state Attorneys General indicated that such predatory lending is "largely perpetrated by non-depository lenders and mortgage brokers [*i.e.*, housing creditors]." *Id.* at 40633. They further expressed concern that the OTS 1996 Rule "had encouraged abusive practices, particularly on the part of non-federally regulated mortgage lenders." *Id.* at 40632.

While OTS acknowledges that the administrative record does not contain comprehensive financial data proving that SHCs abuse prepayment penalties and late charges, it need not have such conclusive proof for the Court to uphold the Amended Rule. Instead, because OTS has made a predictive judgment, based on prior expe-

rience, within its expertise as to the consequences of the Amended Rule on predatory lending practices, the Court must defer to its findings. *See Baltimore Gas & Elec.*, 462 U.S. at 103, 103 S.Ct. 2246. The evidence of a dramatic increase in subprime AMTs following adoption of the 1996 OTS Rule combined with evidence that prepayment penalty and late fee provisions may be subject to abuse indicates that OTS' conclusion that prepayment penalties and late fees may be subject to abuse is reasoned and rational. Given its experience and expertise in this highly technical field, OTS is not required to wait until consumers are defrauded before adopting regulations to protect them.

Plaintiff's argument that OTS should prohibit both federal and state institutions from engaging in these transactions is unpersuasive. First, as addressed above, AMTPA does not require federal and state institutions to be subject to the same regulations—*i.e.*, competitive equality. Second, the Court defers to OTS' reasonable conclusion that federal thrifts do not present a significant problem with regard to these abuses. It is rational for OTS to conclude that its comprehensive regulatory framework—including examination, supervision, and enforcement—governing federal institutions is adequate to discourage predatory lending practices among federal institutions. AR 50533.

In sum, the administrative record contains substantial evidence supporting OTS' conclusion, and the Court defers to its findings.[9]

---

8. Subprimes are loans—typically to borrowers with a blemished credit history—that have a higher interest rate than prime loans.

9. Plaintiff's argument that OTS does not have authority to adopt a regulation to address perceived predatory lending practices is also without merit. There is nothing in the text of Section 807(b) or in AMTPA generally that limits OTS' authority in such a manner. As addressed above, in authorizing OTS to identify regulations that are inappropriate for

SHCs, Congress did not define, and thereby limit, OTS' designation of such inappropriate regulations.

Finally, Plaintiff argues that the Amended Rule is arbitrary and capricious because OTS failed to consider evidence in the 1996 rulemaking record. Because OTS submitted an uncontested declaration indicating that the 1996 record contained no evidence that was not addressed in the Rule itself, there is no reason to conclude that OTS failed to consider any evidence from the prior rulemaking.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **granted,** and Plaintiff's Motion for Summary Judgment is **denied.**

An Order will issue with this Opinion.

### *ORDER*

Plaintiff, National Home Equity Mortgage Association, brings this action under the Administrative Procedure Act, 5 U.S.C. § 706. Plaintiff challenges amendments to 12 C.F.R. § 560.220, which the Office of Thrift Supervision ("OTS") adopted and published as a final rule on September 26, 2002. 67 Fed.Reg. 60542 (Sept. 26, 2002). Defendants are OTS and its Director, James Gilleran. On March 31, 2003, the Court granted the Motion of Amici Curiae the National Community Reinvestment Coalition, *et al.,* to file an Amicus Brief. On April 4, 2003, the Court granted the Motion of Amici Curiae the State Attorneys General to file an Amicus Brief.

This matter is now before the Court on Plaintiff's Motion for Summary Judgment, Defendants' Motion for Summary Judgment, the Brief Amicus Curiae of the National Community Reinvestment Coalition in Support of Defendants' Motion for Summary Judgment, and the Brief Amicus Curiae of the State Attorneys General in Support of Defendants' Motion for Summary Judgment. Upon consideration of the Motions, Oppositions, Replies, the administrative record, and the entire record herein, for the reasons stated in the accompanying Memorandum Opinion, it is this 14th day July 2003, hereby

**ORDERED,** that Defendants' Motion for Summary Judgment [# 14] is **granted;** and it is further

**ORDERED,** that Plaintiff's Motion for Summary Judgment [# 13] is **denied.**