**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NATIONAL HOME EQUITY MORTGAGE
ASSOCIATION,
              *Plaintiff-Appellee,*

              v.

E. JOSEPH FACE, JR., Commissioner
of Financial Institutions, Bureau of
Financial Institutions, Virginia State
Corporation Commission; SUSAN E.
HANCOCK, Deputy Commissioner,
Consumer Finance, Bureau of
Financial Institutions, Virginia State
Corporation Commission,
              *Defendants-Appellants,*

              and

MARK L. EARLEY,
              *Defendant.*

No. 99-2331

NATIONAL HOME EQUITY MORTGAGE
ASSOCIATION,
                    *Plaintiff-Appellee,*

                    v.

MARK L. EARLEY,
                    *Defendant-Appellant,*

                    and

E. JOSEPH FACE, JR., Commissioner                    No. 99-2386
of Financial Institutions, Bureau of
Financial Institutions, Virginia State
Corporation Commission; SUSAN E.
HANCOCK, Deputy Commissioner,
Consumer Finance, Bureau of
Financial Institutions, Virginia State
Corporation Commission,
                    *Defendants.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-99-398-3)

Argued: October 30, 2000

Decided: February 7, 2001

Before NIEMEYER and LUTTIG, Circuit Judges, and
Alexander WILLIAMS, Jr., United States District Judge
for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Luttig and Judge Williams joined.

## COUNSEL

**ARGUED:** Robert A. Dybing, SHUFORD, RUBIN & GIBNEY, Richmond, Virginia, for Appellants. Earle Duncan Getchell, Jr., MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond, Virginia, for Appellee. **ON BRIEF:** James C. Dimitri, William F. Schutt, STATE CORPORATION COMMISSION OF VIRGINIA, Richmond, Virginia; Martha B. Brissette, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Robert L. Hodges, William H. Baxter, II, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Richmond, Virginia, for Appellee.

---

## OPINION

NIEMEYER, Circuit Judge:

We must decide whether a non-federally chartered housing creditor in Virginia may, by complying with the Alternative Mortgage Transaction Parity Act of 1982, include in a home loan agreement an obligation to pay a prepayment fee that exceeds the limits imposed by Virginia Code §§ 6.1-330.83 and 6.1-380.85. For the reasons that follow, we hold that, subject to the non-federally chartered lender's compliance with federal law, it may charge a prepayment fee, despite any limitation imposed by the Virginia Code, because in that circumstance the federal law preempts state law by virtue of § 804(c) of the Parity Act, 12 U.S.C. § 3803(c). Accordingly, we affirm the district court's judgment reaching the same conclusion.

I

The late 1970s and early 1980s witnessed an alarming deterioration in the number of home mortgage lending institutions — "housing creditors" — in part because of their inability to adjust their long-term mortgage portfolios to the high and widely fluctuating short-term deposit interest rates. In response, Congress enacted the Garn-St. Germain Depository Institutions Act of 1982 "to revitalize the housing industry by strengthening the financial stability of home mortgage lending institutions and ensuring the availability of home mortgage

loans." Pub. L. No. 97-320, 96 Stat. 1469 (1982). Title VIII of that act, titled the "Alternative Mortgage Transaction Parity Act of 1982" (the "Parity Act"), was included to "authorize[ ] non-federally chartered housing creditors to offer alternative mortgages in accordance with the Federal regulations issued by the appropriate Federal regulatory agencies. Thus, those creditors will have parity with federally chartered institutions." Sen. Conf. Rep. No. 97-641, at 94 (1982), *reprinted in* 1982 U.S.C.C.A.A.N. 3128, 3137; *see also* 12 U.S.C. § 3801(b). "Alternative mortgages" were understood to refer to those mortgages in which interest rates could be adjusted or renegotiated, in which the maturity date could be shortened, or which included other variations "not common to traditional fixed-rate, fixed-term transactions." Parity Act, § 803(1), 12 U.S.C. § 3802(1).

The practical effect of the statutory scheme is to permit a non-federally chartered housing creditor to make a loan either under state law, in which case the loan transaction remains subject to the full range of state regulations, or under federal law, in which case the loan transaction becomes subject to federal regulations governing similar loans by federally chartered lending institutions. Non-federally chartered housing creditors exercise this regulatory "option" by affirmatively complying with substantive federal regulations identified by the Office of Thrift Supervision. In return for exercising this option, the non-federally chartered housing creditor is promised parity with federally chartered lenders. *See* 12 U.S.C. § 3803. As the Senate Report relevant to the Act observes, the Parity Act "does not place non-federally chartered housing creditors under the supervision of the federal agencies, but instead merely enables them to follow a federal program as an alternative to state law." S. Rep. No. 97-463, at 55 (1982).

In April 1999, *The Compliance Connection*, the official newsletter of Virginia's State Corporation Commission, announced its position that the Parity Act did not preempt Virginia statutory law limiting prepayment penalties. The newsletter explained that "Congress explicitly restricted the [Office of Thrift Supervision's] authority to preemption of only such state laws as related to features '. . . not common to traditional fixed-rate, fixed-term transactions . . . .' The Virginia statutes applicable to prepayment penalties . . . govern a longstanding feature of conventional mortgage lending which Congress left to state law . . . ." The newsletter announced that the Bureau

of Financial Institutions "will continue to cite violations of Virginia statutes relating to prepayment penalties." It noted that licensees would have to notify borrowers of Virginia's prepayment penalty limits and to refund prepayment penalties. The letter also stated, "In addition to possible revocation of license, such violations can be referred to the Attorney General's office for investigation pursuant to Virginia Code § 6.1-430."

In response to this announcement from Virginia officials, the National Home Equity Mortgage Association, a trade association that includes as members non-federally chartered housing creditors, commenced this action seeking a declaratory judgment and an injunction prohibiting Virginia officials from enforcing Virginia's prepayment penalty provisions for loans made under the Parity Act. After the Attorney General for the Commonwealth of Virginia intervened, the district court, on cross-motions for summary judgment, entered judgment in favor of the Mortgage Association and permanently enjoined Virginia officials "from enforcing their announced position that the Parity Act does not preempt Virginia state law limiting prepayment penalties on alternative mortgage transactions." This appeal followed.

## II

Virginia argues principally that the scope of preemption effected by the Parity Act does not preclude it from regulating prepayment penalties in alternative mortgage transactions. It argues,

> [S]tate laws that do not prevent or interfere with [alternative mortgage transactions] are not preempted. Congress defined [alternative mortgage transactions] in § 3802(1) to be loans involving terms "not common to traditional fixed-rate, fixed-term transactions." Prepayment penalties were obviously not included in this definition, because they were and are common to traditional real estate financing. Hence, because the Virginia Statutes do not interfere with the making of [alternative mortgage transactions], they are not preempted.

To decide whether the Parity Act preempts Virginia's statutes regulating prepayment penalties, we must first identify the basic principles of preemption that are applicable.

The Supremacy Clause of the United States Constitution mandates that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, "federal legislation, if enacted pursuant to Congress' constitutionally delegated authority, can nullify conflicting state or local actions." *Worm v. American Cyanamid Co.*, 970 F.2d 1301, 1304-05 (4th Cir. 1992). "Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.'" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (alterations in original)). The "ultimate touchstone" of preemption analysis is the intent of Congress. *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978). Even when Congress' intent is unclear, state law must nevertheless yield when it conflicts with federal law. In making the determination of whether state law conflicts with federal law, the test to apply is whether "it is impossible to comply with both state and federal law" or whether "the state law stands as an obstacle to the accomplishment of the full purposes and objectives" of the relevant federal law. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984); *see also Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1413 (4th Cir. 1994).

In enacting the Parity Act, Congress clearly intended to preempt state law to the extent it authorized non-federally chartered housing creditors to take advantage of the federal regulations for alternative mortgage transactions that govern federally chartered lending institutions.* Section 802(a)(3) of the Parity Act states that the Office of

---

*The Office of Thrift Supervision has used the rule-making authority conferred on it by §§ 4(a) and 5(a) of the Home Owners Loan Act ("HOLA"), 12 U.S.C. §§ 1463(a)(2), 1464(a), to permit federally chartered thrifts to charge prepayment penalties as specified in the lending documents, regardless of whether the loan is a traditional fixed-interest loan or an alternative mortgage transaction. *See* 12 C.F.R. §§ 560.2(b)(5), 560.34. Virginia does not contend that *federally* chartered institutions must comply with state limitations on prepayment penalties.

Thrift Supervision ("OTS"), formerly known as the Federal Home Loan Bank Board, as well as other agencies, "have recognized the importance of alternative mortgage transactions and have adopted regulations authorizing federally chartered depository institutions to engage in alternative mortgage financing." 12 U.S.C. § 3801(a)(3). And § 3801 continues, "It is the purpose of this title to eliminate the discriminatory impact that those regulations have upon nonfederally chartered housing creditors and provide them with parity with federally chartered institutions by authorizing all housing creditors to make . . . alternative mortgage transactions so long as the transactions are in conformity with the regulations issued by the Federal agencies." *Id*. § 3801(b).

The operative language of the Parity Act, contained in 12 U.S.C. § 3803, provides that state-chartered deposit institutions and other non-federally chartered housing creditors "may make . . . alternative mortgage transactions" to the extent that they are "made in accordance with [federal] regulations governing alternative mortgage transactions . . . for federally chartered savings and loan associations" and that the regulations are legally issued by the OTS or other relevant agency. *Id*. § 3803(a)(3). And critically, the same section provides that a non-federally chartered housing creditor may make an alternative mortgage transaction pursuant to applicable federal regulations "notwithstanding any State constitution, law, or regulation." *Id*. § 3803(c). Thus, to the extent that a non-federally chartered housing creditor makes a loan in compliance with federal regulations for alternative mortgage transactions, it may do so despite contrary state law.

The particular issue presented in this case is whether a non-federally chartered institution in Virginia may require and enforce a prepayment fee in a mortgage agreement notwithstanding Virginia's limitation on prepayment penalties as contained in Virginia Code §§ 6.1-330.83 and 6.1-330.85. The resolution of this issue depends on whether the OTS has issued regulations authorizing prepayment fees as part of its regulations for alternative mortgage transactions, because if it has authorized the collection of prepayment fees in alternative mortgage transactions, then Virginia may not apply its law proscribing such prepayment fees if the non-federally chartered housing creditor has otherwise complied with the requirements of the Parity Act. Although a non-federally chartered lender could, under federal

law, forego charging a prepayment fee and thereby comply with Virginia law, to deny the lender the right to make that election by prohibiting it from charging a fee in excess of Virginia's caps would frustrate the federal law's purpose of giving the state-chartered lender parity with the federally chartered lender and therefore would conflict with federal law. *See Silkwood*, 464 U.S. at 248.

Because it is undisputed that federally chartered thrifts are authorized by federal law to charge prepayment penalties by contract, the narrow question we must answer is whether the regulation of prepayment penalties is part and parcel of the federal regulations governing alternative mortgage transactions. Here, history is a persuasive indicator.

Prior to the enactment of the Parity Act, the Federal Home Loan Bank Board, the predecessor to the OTS, had adopted several regulations governing alternative mortgage transactions. Not only did these regulations permit rate adjustments, balloon payments, and other variations in interest and amortization rates, but they also regulated the prepayment of interest by prohibiting a prepayment penalty unless the loan agreement included: "(1) a prepayment penalty, (2) an interest rate that, after loan closing and after any interest-rate adjustment remains fixed for a period of at least five years, and (3) only such increases in the loan balance as a result from the deferral and capitalization of interest pursuant to § 545.6-2(a)(2)(iv) of this Part." 12 C.F.R. § 545.8-5(b) (1983). This regulation also placed a limit on the size of a prepayment penalty that could be collected. In providing notice of this regulation, first promulgated in August 1982, the Federal Home Loan Bank Board stated:

> The proposed amendments would have permitted the imposition of a penalty for the prepayment of all or any part of a loan only if the loan carried a fixed interest rate and permitted no adjustments except to the loan balance resulting from the deferral and capitalization of interest. The Board's previous *alternative mortgage instrument regulations . . .* required associations to permit borrowers to prepay such loans in whole or in part at any time without penalty.
>
> The final regulation retains the proposed amendments with one change. Associations will be permitted to impose

a prepayment penalty if the loan contract provides that, after loan closing and after each interest rate adjustment, the interest rate remains fixed for a period of at least five years.

Home Loan Amendments, 47 Fed. reg. 36,612, 36,615 (Aug. 23, 1982) (summary of contents) (emphasis added). This explanation provided by the Board in connection with its 1982-83 regulations clearly places the regulation of prepayment penalties within the regulation of "alternative mortgage instruments."

In its current federal regulation, OTS continues to regulate prepayment penalties as part of the alternative mortgage transaction regulations. Section 560.220, entitled "Alternative Mortgage Parity Act," provides that non-federally chartered housing creditors

may make alternative mortgage transactions as defined by [12 U.S.C. § 3803] and further defined and described by applicable regulations identified in this section, notwithstanding any state constitution, law, or regulation. In accordance with section 807(b) of Public Law 97-320, 12 U.S.C. § 3801 note, §§ 560.33 [Late charges], *560.34 [Prepayments]*, 560.35 [adjustments to home loans], and 560.210 [Disclosures for variable rate transactions] of this part are identified as appropriate and applicable to exercise of this authority and all regulations not so identified are deemed inappropriate and inapplicable.

12 C.F.R. § 560.220 (emphasis added).

Thus, the Parity Act and the regulations, to which it explicitly refers, provide that when a non-federally chartered housing creditor elects to be governed by federal law and complies with that law, it may charge a contractually specified prepayment fee as authorized by federal law, despite the fact that Virginia law provides otherwise. Any other rule would contradict the explicit language of 12 U.S.C. § 3803(c) which provides that "[a]n alternative mortgage transaction may be made by a housing creditor in accordance with this section, notwithstanding any State constitution, law, or regulation." It would also deny the non-federally chartered housing creditor parity with federal institutions when entering into alternative mortgage transactions.

Virginia argues that the definition of an alternative mortgage transaction in 12 U.S.C. § 3802(1) is limited to transactions with terms that are "not common to traditional fixed-rate, fixed-term transactions" and therefore does not include transactions involving prepayment penalties because such penalties *are* common to fixed-rate loans. That clause, however, refers to the essential nature of an alternative mortgage as including variable rates of interest or amortization. It does not specify the terms that such a transaction may or may not include or what regulations may apply. Most importantly, it does not limit the scope of the preemptive force of § 3803(c). That scope is defined in § 3803, which provides that non-federally chartered housing creditors "may make . . . alternative mortgage transactions" as defined in § 3802(1), and that if they do, they must be made "in accordance with regulations governing alternative mortgage transactions as issued by the Director of the Office of Thrift Supervision for federally chartered savings and loan associations." *Id.* § 3803(a)(3). And, defining the scope of preemption, subsection (c) provides that a loan made *within the scope of such regulations* may be made despite a conflicting state provision. It is undisputed that the regulations for making alternative mortgage transactions not only regulate the prepayment of interest, but also explicitly authorize the collection of prepayment penalties if they are agreed to in the loan agreement. *See* 12 C.F.R. §§ 560.34, 560.220.

Virginia also argues that the federal agencies' imperfect implementation of § 807(b) of the Parity Act indicates the lack of relevance of federal prepayment regulations to alternative mortgage transactions. Section 807(b) provides that the Federal Home Loan Bank Board, as well as other agencies, are required to "publish those portions or provisions of their respective regulations *that are inappropriate for* (and thus inapplicable to), *or that need to be conformed for the use of*, the non-federally chartered housing creditors to which their respective regulations apply." 12 U.S.C. § 3801 note (emphasis added). The Federal Home Loan Bank Board's implementation of § 807(b) published the regulations that were applicable, rather than those inapplicable as directed by the statute, and then it omitted its regulation of prepayment penalties. Virginia argues that this omission indicates that prepayment penalty regulations are not intended to be part of the alternative mortgage transaction regulations.

First, it must be noted that current regulations implementing § 807(b) do not omit prepayment penalty regulations from the list of regulations applicable to alternative mortgage transactions. *See* 12 C.F.R. § 560.220. Second, Virginia can derive little benefit from the original omission. Section 807(b) is not a provision that defines the scope of federal preemption. Rather, it defines the gate through which the non-federally chartered housing creditors must pass in order to obtain the benefits of the Parity Act. If a state lender conforms to the regulations listed in the regulation implementing § 807(b), then it will enjoy the preemptive protection that the Act grants in 12 U.S.C. § 3803(c). Accordingly, the implementation of § 807(b) provides Virginia with little support.

Finally, Virginia argues that the OTS was without authority to adopt 12 C.F.R. § 560.220 because 12 U.S.C. § 3803(a) is not an authorizing provision, but rather presumes the preexistence of regulations. Any regulation referred to in § 3803, it argues, must be authorized elsewhere. Again, this argument misconstrues the role of 12 C.F.R. § 560.220. That regulation was not authorized by § 3803(a), but by the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1461 *et seq.*, and it was adopted pursuant to HOLA as directed by § 807(b) of the Parity Act, which instructs non-federally chartered institutions how to take advantage of the Parity Act. The regulations referred to in § 3803(a) were indeed adopted originally by the Federal Home Loan Bank Board and later by the OTS and other implicated agencies pursuant to their authorizing statutes. In the case of the OTS, the regulations were adopted explicitly under HOLA, as authorized pursuant to 12 U.S.C. §§ 1463(a)(2) and 1464(a); *see also* 12 C.F.R. §§ 560.1, 560.2 (generally drawing on 12 U.S.C. § 1462 *et seq.* for authority to adopt regulations involving alternative mortgage transactions). Thus, we reject Virginia's argument challenging 12 C.F.R. § 560.220.

In sum, we hold that non-federally chartered housing creditors in Virginia — as they are defined in 12 U.S.C. § 3802(2) — may elect to have their alternative mortgage transactions governed by the federal law applicable to federally chartered housing creditors engaging in similar transactions by complying with that law, and when they do, that law, which includes 12 C.F.R. § 560.34 (regulating prepayments and authorizing a prepayment fee), preempts Virginia Code §§ 6.1-330.83 and 6.1-330.85, which limits the imposition of prepayment

penalties. This conclusion is required by 12 U.S.C. § 3803 and is clearly consistent with the *raison d'etre* of the Parity Act — giving State-chartered lending institutions parity with federally chartered lending institutions. *See* 12 U.S.C. § 3801(b).

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.