848 A.2d 747

MARK GLUKOWSKY, PLAINTIFF–RESPONDENT, v. EQUITY ONE, INC., A DELAWARE CORPORATION, DEFENDANT–APPELLANT.

Argued February 3, 2004—Decided May 26, 2004.

50

*Mark S. Melodia* argued the cause for appellant (*Reed Smith*, attorneys; *Mr. Melodia and Lauren Graham Delehey*, on the brief).

*Lewis G. Adler* argued the cause for respondent (*Mr. Adler*, attorney; *Mr. Adler, Roger C. Mattson and Louis D. Fletcher*, on the briefs).

*Dennis R. Casale* argued the cause for amicus curiae Mortgage Bankers Association of New Jersey (*Levy & Watkinson and Pepper Hamilton*, attorneys; *Mr. Casale and E. Robert Levy* of counsel; *Mr. Casale, Mr. Levy and Michael G. Petrone*, on the brief).

*David McMillin* argued the cause for amicus curiae Legal Services of New Jersey (*Melville D. Miller, Jr.*, President, attorney; *Mr. McMillin, Carrie Ferraro, Gwen E. Orlowski and Rebecca Shore*, on the brief).

*William H. Hyatt, Jr.* submitted a brief on behalf of amicus curiae National Home Equity Mortgage Association (*Kirkpatrick & Lockhart*, attorneys).

*Michael M. Horn* submitted a brief on behalf of amici curiae American Bankers Association, American Financial Services Association, America's Community Bankers, Consumer Bankers Association, Consumer Mortgage Coalition, Mortgage Bankers Association of America, New Jersey Financial Services Association and New Jersey League of Community Bankers (*McCarter & English*, attorneys; *Mark D. Knoll*, on the brief).

Justice ALBIN delivered the opinion of the Court.

In 1996, the federal Office of Thrift Supervision (OTS) issued a regulation authorizing state housing lenders to charge prepayment

penalties in alternative mortgage transactions (AMT). Alternative Mortgage Transaction Parity Act, 12 *C.F.R.* § 560.220 (1996). That regulation would preempt our state laws that prohibit housing lenders from charging prepayment penalties. Plaintiff contends that OTS exceeded the scope of authority delegated to it by Congress under the Alternative Mortgage Transaction Parity Act of 1982, 12 *U.S.C.A.* §§ 3801–06 (Parity Act), when it issued 12 *C.F.R.* § 560.220. In determining whether that federal regulation is valid, we address principles concerning the scope of authority granted to a regulatory agency, preemption, and comity.

## I.

In 1999, plaintiff Mark Glukowsky secured a $72,000 mortgage loan from defendant Equity One to finance the purchase of a home in Mount Laurel. The financing arrangement provided a fixed-interest rate over a ten-year term at the end of which the loan, though not fully amortized, would mature. On the maturity date in 2009, plaintiff would owe $62,021.25 of the principal and have the choice to pay the entire principal or refinance the loan with Equity One or another lender. This method of financing a residential mortgage is commonly referred to as a "balloon loan" and constitutes an AMT under the Parity Act. An AMT is a loan with an interest rate or finance charge that may be adjusted or renegotiated; a loan with a fixed-interest rate that matures before it is fully amortized, thus implicitly permitting rate adjustments; or a loan with other variations "not common to traditional fixed-rate, fixed-term transactions." 12 *U.S.C.A.* § 3802(1).

As part of the mortgage contract, plaintiff agreed to pay a prepayment fee to Equity One if he repaid the loan in full during the first three years of its term.[1] The mortgage contract also contained a "due on sale" clause, providing that if the mortgaged

---

[1] Under the terms of the Prepayment Rider, full repayment of the loan in the first year would result in a prepayment fee equal to three percent of the amount being prepaid, in the second year a two percent fee, and in the third year a one percent fee.

property was sold or transferred without Equity One's prior written consent, the full amount of the loan would be due on demand. In 2001, plaintiff sold the Mount Laurel residence subject to the mortgage and "due on sale" clause. Equity One exercised its right to demand full payment of the loan and sent plaintiff a pay-off statement. That statement included a two percent prepayment fee in the amount of $1,427.97 because the outstanding balance on the loan was to be paid within the second year of the mortgage term. Plaintiff paid the prepayment fee under protest.

Plaintiff later filed a complaint alleging that Equity One had violated New Jersey's Prepayment Penalty Law, *N.J.S.A.* 46:10B–2, Market Rate Consumer Loan Act, *N.J.S.A.* 17:3B–22, and Consumer Fraud Act, *N.J.S.A.* 56:8–2, by collecting the prepayment fee. Equity One moved to dismiss the complaint on the ground that it was preempted by 12 *C.F.R.* § 560.220, which barred enforcement of any state law that prohibited a state-chartered lending institution from charging a prepayment fee on an AMT.

Before the promulgation of 12 *C.F.R.* § 560.220 by OTS in 1996, federal lenders were free to charge prepayment fees on AMTs pursuant to 12 *C.F.R.* § 560.34, while state lenders, such as Equity One, were subject to state laws, many of which prohibited prepayment fees in real estate transactions. The adoption of 12 *C.F.R.* § 560.220 placed state-chartered housing creditors on an equal footing with their federal counterparts by extending 12 *C.F.R.* § 560.34 to state lenders and preempting any state law that forbid charging a prepayment fee on an AMT. The Law Division found that 12 *C.F.R.* § 560.220 barred enforcement of New Jersey's Prepayment Penalty Law and dismissed the complaint on the basis of federal preemption.

The Appellate Division reversed and held that OTS exceeded the scope of its authority under the Parity Act when it applied 12 *C.F.R.* § 560.34 to state lending institutions engaged in AMTs. *Glukowsky v. Equity One, Inc.*, 360 *N.J.Super.* 1, 12, 821 *A.*2d 485

(2003). The panel concluded that Congress did not intend the Parity Act to preempt state consumer protection laws that prohibited the imposition of prepayment fees on real estate transactions in general, and on AMTs in particular. *Id.* at 37–39, 821 *A.2d* 485. The panel reinstated the claims that alleged violations of New Jersey's Prepayment Law and Consumer Fraud Act, but affirmed the dismissal of the claim arising under the Market Rate Consumer Loan Act because that statute did not apply to defendant. *Id.* at 48, 821 *A.2d* 485. Plaintiff was allowed to amend his complaint to allege other claims arising under federal and state law.[2] *Ibid.* The panel did not address whether to apply its decision retroactively, leaving that issue to be developed on remand. *Ibid.*

We granted Equity One's petition for certification. 177 *N.J.* 575, 832 *A.2d* 325 (2003). We also granted the motions of the American Bankers Association, *et al.*,[3] the National Home Equity Mortgage Association, the Mortgage Bankers Association of New Jersey, and Legal Services of New Jersey for leave to participate as *amici curiae.*

The central issue in this case is whether the Parity Act gave OTS the authority to adopt the challenged regulation. To determine whether 12 *C.F.R.* § 560.220 is a valid expression of legisla-

---

[2] In his brief before the Appellate Division, plaintiff argued for the first time that defendant's collection of a prepayment penalty violated the federal due-on-sale regulation, 12 *C.F.R.* § 591.5(b)(2)(i); the New Jersey Licensed Lenders Act, *N.J.S.A.* 17:11C–1 to –49; and general contract law principles prohibiting unconscionable contract terms. *Glukowsky, supra,* 360 *N.J.Super.* at 10, 821 *A.2d* 485. Plaintiff neither pleaded those claims in his complaint nor moved to amend the complaint to state such claims. *Id.* at 10–11, 821 *A.2d* 485. Nevertheless, after reinstating the complaint, the Appellate Division allowed plaintiff to amend the complaint to assert those new claims. *Id.* at 47, 821 *A.2d* 485.

[3] Amici are American Bankers Association, American Financial Services Association, America's Community Bankers, Consumer Bankers Association, Consumer Mortgage Coalition, Mortgage Bankers Association of America, New Jersey Financial Services Association, and New Jersey League of Community Bankers. Those organizations represent mortgage lenders who make and service mortgage loans in New Jersey and nationwide.

tive authority, we first turn to the history of the Parity Act and the rule adopted by OTS.

## II.

### A.

In the late 1970s and early 1980s, an increasingly volatile interest rate market seriously impaired the ability of housing creditors to provide consumers with fixed-term, fixed-rate mortgages secured by residential property. *Nat'l Home Equity Mortgage Ass'n v. Face*, 239 *F*.3d 633, 635 (4th Cir.), *cert. denied*, 534 *U.S.* 823, 122 *S.Ct.* 58, 151 *L.Ed.*2d 26 (2001); 12 *U.S.C.A.* § 3801(a)(1). Those market conditions made it exceedingly difficult for consumers to obtain and afford credit for the purchase of a home. *See Grunbeck v. Dime Sav. Bank of N.Y., FSB*, 74 *F*.3d 331, 343 (1st Cir.1996).

In response to the precarious state of the residential mortgage market, "Congress enacted the Garn St. Germain Depository Institutions Act of 1982 to revitalize the housing industry by strengthening the financial stability of home mortgage lending institutions and ensuring the availability of home mortgage loans." *Face, supra*, 239 *F*.3d at 635 (internal quotation marks omitted). Title VIII of that legislation, the Parity Act, allowed state-chartered housing creditors to offer alternative mortgages if they agreed to operate in accordance with federal regulations. *Ibid.* (citing S. Conf. Rep. No. 97–641, at 94 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3128, 3137). The ability of state lending institutions to issue AMTs was seen by Congress as essential to ensure the nation an adequate supply of housing credit. 12 *U.S.C.A.* § 3801(a)(2). Before passage of the Parity Act, federally-chartered lenders were authorized to engage in alternative mortgage financing. *See* 12 *U.S.C.A.* § 3801(a)(3). However, twenty-six states either prohibited state-chartered lenders from engaging in AMTs or imposed on those lenders burdensome restrictions. *Alternative Mortgage Transaction Parity Act; Preemption*, 67 *Fed.*

*Reg.* 60,542, 60,543 (2002) (to be codified at 12 *C.F.R.* § 560.220) [hereinafter *2002 Final Rule* ].

The express legislative purpose of the Parity Act is

to eliminate the discriminatory impact that [federal] regulations [authorizing federally chartered housing creditors to engage in AMTs] have upon nonfederally chartered housing creditors and provide them *with parity* with federally chartered institutions by authorizing all housing creditors *to make, purchase, and enforce alternative mortgage transactions so long as the transactions are in conformity with the regulations issued by the Federal agencies.*

[12 *U.S.C.A.* § 3801(b) (emphasis added).]

To achieve the goals of the Parity Act, Congress granted to the Federal Home Loan Bank Board (FHLBB), the predecessor to OTS, and two other federal agencies, the rulemaking authority "to prevent discrimination against" state-chartered lending institutions engaged in "making, purchasing, and enforcing alternative mortgage transactions." [4] 12 *U.S.C.A.* § 3803(a)(3). That rulemaking authority included the power to promulgate regulations in furtherance of the Parity Act "notwithstanding any State constitution, law, or regulation." 12 *U.S.C.A.* § 3803(a)(3) and (c). In 1989, the statute was amended to substitute OTS for the FHLBB as the agency regulating state-chartered housing lenders. Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, § 744(c), 103 Stat. 183 (1989) (codified at 12 *U.S.C.A.* § 3801(a)(3)).

States were not bound involuntarily to the Parity Act. Those states wishing to opt-out of the Act's preemption provisions only needed to certify an intention to do so within three years of its passage. 12 *U.S.C.A.* § 3804. New Jersey did not avail itself of that option. *Glukowsky, supra,* 360 *N.J.Super.* at 21, 821 *A.2d* 485. By not exiting the federal program within the three-year

---

[4] State-chartered banks and state-chartered credit unions must comply with regulations issued by the Comptroller of the Currency for national banks and the National Credit Union Administration Board for federal credit unions, respectively. 12 *U.S.C.A.* § 3803(a)(1) and (2). All other non-federally-chartered housing creditors lending in reliance on the Parity Act must comply with regulations issued by OTS, or its predecessor, FHLBB. *Id.* § 3803(a)(3).

period, the State necessarily agreed to follow all applicable federal regulations, those in existence then and those to be adopted in the future.[5]

Congress directed OTS to "identify, describe, and publish those portions of [its] regulations that are inappropriate for (and thus inapplicable to) ... nonfederally chartered housing creditors." [6] Pub.L. No. 97–320, § 807(b), 96 Stat. 1469 (1982). Based on the broad rulemaking authority delegated to it pursuant to 12 *U.S.C.A.* §§ 1463(a)(2), 1464(a) of the Home Owners' Loan Act, 12 *U.S.C.A.* § 3803(a)(3), and § 807(b) of the Parity Act, OTS in 1996 adopted 12 *C.F.R.* § 560.220, giving state-chartered housing lenders the same authority to impose prepayment penalties on AMTs already possessed by their federal counterparts. *Face, supra,* 239 F.3d at 640; *Shinn v. Encore Mortgage Servs., Inc.,* 96 *F.Supp.*2d 419, 423–24 (D.N.J.2000).

12 *C.F.R.* § 560.220 extended the benefit of four federal regulations to state-chartered housing lenders engaged in AMTs,

---

[5] Our dissenting colleagues suggest that, because the New Jersey Legislature did not anticipate OTS's adoption of 12 *C.F.R.* § 560.220, the regulation is infirm. However, when the states agreed to be bound by the federal regulatory framework involving the Parity Act, those states necessarily agreed to follow all applicable federal regulations in furtherance of the Parity Act. The states knew that they could not exit the program merely because they disagreed with a particular federal regulation. Nowhere in this record is there a suggestion that New Jersey would have opted out had it known that OTS would adopt 12 *C.F.R.* § 560.220.

[6] The FHLBB in 1983 issued a Final Rule that identified three of its regulations that "describe and define" AMTs, and thus also would be applied to state-chartered housing creditors: § 545.33(c), granting authority to engage in AMTs; § 545.33(e), limiting adjustments to loans secured by borrower-occupied property; and § 545.33(f)(4)-(11), imposing disclosure requirements on AMTs secured by borrower-occupied property. *Implementation of New Powers; Limitation on Loans to One Borrower,* 48 *Fed.Reg.* 23,032, 23,053 (1983). The FHLBB deemed all of its other regulations to be inappropriate and, therefore, inapplicable to AMTs. *Ibid.* The FHLBB did not identify any regulations that applied to mortgage loans generally, and specifically did not apply its regulations regarding prepayment penalties to state-chartered lenders. *Ibid.*

"notwithstanding any state constitution, law, or regulation." [7] Only one of those regulations, 12 *C.F.R.* § 560.34, is relevant to this case. That regulation provides:

> Any prepayment on a real estate loan must be applied directly to reduce the principal balance on the loan unless the loan contract or the borrower specifies otherwise. *Subject to the terms of the loan contract, a Federal savings association may impose a fee for any prepayment of a loan.*
> [12 *C.F.R.* § 560.34 (emphasis added).]

By applying 12 *C.F.R.* § 560.34 to state lenders issuing AMTs, 12 *C.F.R.* § 560.220 clearly preempted enforcement of New Jersey's Prepayment Penalty Law.

The adoption of 12 *C.F.R.* § 560.220 followed a 1996 OTS opinion letter holding that by virtue of the Parity Act Wisconsin-chartered savings and loan associations issuing AMTs were not subject to that state's prepayment penalty law. *Effect of Parity Act on Wisconsin Prepayment Penalty Statute,* Op. Chief Counsel, OTS No. P–96–6 (Apr. 30, 1996). OTS reasoned that

> [i]f state housing creditors were required to follow the Wisconsin Statute when making variable-rate mortgage loans, they would clearly be disadvantaged vis-à-vis federal thrifts—the very result Congress intended to prevent. The Wisconsin Statute thus appears to fall within the scope of laws preempted by the Parity Act. Accordingly, state savings associations and state housing creditors that are not state banks or credit unions and that originate variable-rate loans in conformity with all applicable OTS regulations need not comply with the Wisconsin Statute. [*Ibid.*]

---

[7] The version of 12 *C.F.R.* § 560.220 made effective October 30, 1996 provided:

> Pursuant to 12 *U.S.C.* 3803, housing creditors that are not commercial banks, credit unions, or Federal savings associations may make alternative mortgage transactions as defined by that section and further defined and described by applicable regulations identified in this section, notwithstanding any state constitution, law, or regulation. In accordance with section 807(b) of Public Law 97–320, 12 *U.S.C.* 3801 note, §§ 560.33, 560.34, 560.35, and 560.210 of this part are identified as appropriate and applicable to the exercise of this authority and all regulations not so identified are deemed inappropriate and inapplicable. Housing creditors engaged in credit sales should read the term "loan" as "credit sale" wherever applicable.
> [*Lending and Investment,* 61 *Fed.Reg.* 50,951, 50,983 (1996) (to be codified at 12 *C.F.R.* § 560.220) [hereinafter *1996 Final Rule*].]

Based on that analysis, 12 *C.F.R.* § 560.34 was made applicable to state lenders through 12 *C.F.R.* § 560.220.

In 2002, OTS proposed a rule change removing 12 *C.F.R.* § 560.34 from 12 *C.F.R.* § 560.220, thereby eliminating the preemption provision that barred enforcement of state prepayment laws against state lenders engaged in AMTs. During that rulemaking process, OTS reexamined the appropriateness of regulating prepayment fees and late charges relating to AMTs by state lenders. *See 2002 Final Rule, supra,* 67 *Fed.Reg.* 60,542; *Alternative Mortgage Transaction Parity Act; Preemption,* 67 *Fed. Reg.* 20,468 (2002) (to be codified at § 560.220) (proposed Apr. 25, 2002) [hereinafter *2002 Notice of Proposed Rulemaking* ]; *2000 Advance Notice of Proposed Rulemaking, supra,* 65 *Fed.Reg.* at 17,814. OTS acknowledged that whether Congress intended to preempt state laws governing prepayment fees fell within a "gray area." *2002 Notice of Proposed Rulemaking, supra,* 67 *Fed.Reg.* at 20,470. The Parity Act and its legislative history provided OTS with little direction as to which federal regulations were to apply to state-chartered housing creditors that engage in the making, purchasing, and enforcing of AMTs. *2002 Final Rule, supra,* 67 *Fed.Reg.* at 60,543. When OTS decided to regulate prepayment fees in 1996 pursuant to the Parity Act, it did so believing that Congress intended to remedy the disadvantage to state-chartered institutions that flowed from differing federal and state laws regulating AMTs. 12 *U.S.C.A.* § 3801(b). By 2002, however, after 12 *C.F.R.* § 560.220 had been on the books for six years, OTS had knowledge that widespread use of prepayment penalties in subprime loans promoted predatory lending practices.[8] *2002 Final Rule, supra,* 67 *Fed.Reg.* at 60,547–48. In the year prior to passage of the Parity Act only about ten percent of sub-prime

---

[8] Sub-prime loans have higher interest rates than prime loans and typically are extended to borrowers whose past credit problems make them a higher risk. *Nat'l Home Equity Mortg. Ass'n v. OTS,* 271 *F.Supp.*2d 264, 277 n. 8 (D.C.Cir. 2003); *2000 Advance Notice of Proposed Rulemaking, supra,* 65 *Fed.Reg.* at 17,814.

loans included prepayment penalties, but by 1999 that figure had risen to approximately seventy to seventy-six percent. *Id.* at 60,547 (citing data from the Joint HUD/Treasury Report on Recommendations to Curb Predatory Home Mortgage Lending (Apr. 20, 2000)). Anecdotal evidence also suggested that predatory lending practices disproportionately targeted minorities and the elderly. *Ibid.*

Because the 1996 OTS regulation preempted state laws prohibiting prepayment penalties only as applied to AMTs, it also had the unintended consequence of creating an incentive for state lenders to favor AMTs over traditional fixed-interest mortgages that still were subject to state prepayment penalty laws. *See 2002 Final Rule, supra,* 67 *Fed.Reg.* at 60,546; *2002 Notice of Proposed Rulemaking, supra,* 67 *Fed.Reg.* at 20,469. Last, OTS no longer accepted the "apparent rationale" for its 1996 rule that absent preemption of state prepayment laws "state housing creditors would be disadvantaged vis-à-vis federal thrifts." *Id.* at 60,543. Based on this new reality, OTS reasoned that state laws regulating prepayment fees and late charges should "reflect each state legislature's judgment, after due consideration, about appropriate consumer protections applicable to state-chartered lenders." *Id.* at 60,548. OTS would not "construe its authority under [the Parity Act] to frustrate these state efforts where another less intrusive construction of [the Parity Act] is permissible." *Ibid.*

In its *2002 Final Rule,* effective July 2003, OTS eliminated § 560.34 from the list of federal regulations applicable to state-chartered housing creditors, finding that a creditor's ability to assess prepayment fees was "not essential or intrinsic to the ability to offer alternative mortgages." *2002 Final Rule, supra,* 67 *Fed.Reg.* at 60,544. Nevertheless, OTS concluded in the 2002 Final Rule that its 1996 regulation was a permissible interpretation at the time. *Id.* at 60,550.

### B.

In light of that legislative and regulatory history, we return to the rationale provided by the Appellate Division for holding that

OTS acted without legislative authority in adopting the 1996 version of 12 *C.F.R.* § 560.220. The appellate panel sought to divine what Congress intended when it spoke in terms of state-chartered lending institutions achieving parity with federally-chartered institutions in "making, purchasing, and enforcing alternative mortgage transactions." *Glukowsky, supra,* 360 *N.J.Super.* at 27, 36–38, 821 *A.*2d 485; 12 *U.S.C.A.* § 3803(a)(3). Did Congress intend a narrow purpose, preempting only those state laws that prohibited state lenders from marketing AMTs or did Congress have a more expansive purpose, achieving competitive equality between state- and federally-chartered lenders? The panel interpreted the Parity Act as having the limited purpose of preempting only those state laws that prohibited or restricted a state-chartered lending institution from marketing an AMT. *Glukowsky, supra,* 360 *N.J.Super.* at 40, 821 *A.*2d 485. The panel found that OTS had construed the purpose of the Parity Act too broadly by attempting to achieve "complete parity between federally and non-federally chartered housing creditors." *Id.* at 37, 821 *A.*2d 485. In the panel's view, Congress did not intend "that every AMT, throughout the nation, must contain, or at least offer, the same terms, down to the minutiae of regulating the fees and penalties which may be imposed." *Ibid.* Accordingly, the 1996 extension of 12 *C.F.R.* § 560.34 to state lenders was an impermissible interpretation of the Parity Act because the Act was not intended to create precise equality between state and federal lenders that issued AMTs.

Although the Appellate Division acknowledged that an agency's interpretation of a statute falling within its regulatory authority is entitled to deference, it found that the 1996 version of 12 *C.F.R.* § 560.220 was " 'entitled to considerably less deference,' " because it represented a sharp change from the agency's prior interpretation of the Parity Act. *Id.* at 42–43, 821 *A.*2d 485 (quoting *Good Samaritan Hosp. v. Shalala,* 508 *U.S.* 402, 417, 113 *S.Ct.* 2151, 2161, 124 *L.Ed.*2d 368, 383 (1993)). While noting that an agency may support a change of direction by a reasoned analysis, the panel concluded that the *1996 Final Rule* "was not supported by

any reasoning at all." *Id.* at 32, 821 *A.2d* 485. The panel relied on language in the *2002 Notice of Proposed Rulemaking,* in which OTS suggested that it had not explained sufficiently its reasons for adopting the 1996 rule and its departure from the prior standard of permitting state laws to regulate prepayment fees in AMTs. *Ibid.* (citing 67 *Fed.Reg.* at 20,470). The panel considered the language in OTS's *2002 Notice of Proposed Rulemaking* a tacit admission that it had exceeded the authority delegated to it by Congress in promulgating the 1996 regulation. *Id.* at 33, 821 *A.2d* 485. Reasoning that prepayment penalties do not prohibit or interfere with a housing creditor's ability to make, purchase, or enforce AMTs, the panel concluded that OTS never had authority to apply 12 *C.F.R.* § 560.34 to state-chartered lenders.

We disagree with the conclusion reached by the Appellate Division that OTS exceeded the authority Congress delegated to it in the Parity Act. Congress's intent is not entirely clear from the statutory language. We accept OTS's explanation that its 1996 rulemaking represented one permissible interpretation of the Parity Act. OTS is the agency responsible for enforcing the Parity Act and its interpretation of that Act is entitled to substantial deference. Moreover, the principle of comity instructs state courts to give due regard to a federal court's interpretation of a federal statute. *Dewey v. R.J. Reynolds Tobacco Co.,* 121 *N.J.* 69, 80, 577 *A.*2d 1239 (1990). Federal courts uniformly have concluded that OTS in 1996 acted within the authority delegated to it by Congress by incorporating § 560.34 into 12 *C.F.R.* § 560.220 to allow state-chartered lenders to impose prepayment penalties in AMTs. *McCarthy v. Option One Mortgage Corp.,* 362 *F.*3d 1008, 1010–11 (7th Cir.2004); *Nat'l Home Equity Mortgage Ass'n v. Face, supra,* 239 *F.*3d at 639–40; *Shinn v. Encore Mortgage Servs., Inc., supra,* 96 *F.Supp.*2d at 424, 426.

### III.

The power of a federal statute to preempt a state law is derived from the Supremacy Clause of the United States Constitu-

tion. *U.S. Const.* art. VI., cl. 2; *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 *U.S.* 141, 152, 102 *S.Ct.* 3014, 3022, 73 *L.Ed.*2d 664, 674 (1982). Congress can pass legislation that either explicitly or implicitly preempts state law. *Id.* at 152–53, 102 *S.Ct.* at 3022, 73 *L.Ed.*2d at 675. That Congress intended the Parity Act to have preemptive power over state laws is clear, but less clear is which laws it intended to preempt. OTS, one of the regulatory agencies responsible for enforcement of the Parity Act, was left to determine the general goals of the Act and to interpret its cryptic language.

 The regulations of a federal agency are given the same weight and afforded the same presumptions regarding preemption as federal statutes unless the regulations are "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 *U.S.* 837, 844, 104 *S.Ct.* 2778, 2782, 81 *L.Ed.*2d 694, 703 (1984). A federal regulation will have preemptive effect provided the agency intended to preempt state law and acted within the scope of its authority. *Fid. Fed., supra,* 458 *U.S.* at 154, 102 *S.Ct.* at 3023, 73 *L. Ed.*2d at 675; *Turner v. First Union Nat'l Bank,* 162 *N.J.* 75, 88, 740 *A.*2d 1081 (1999).

 A court generally must defer to a regulatory agency's decision, unless the agency acts outside the scope of its authority or arbitrarily. *Fid. Fed., supra,* 458 *U.S.* at 153–54, 102 *S.Ct.* at 3022–23, 73 *L.Ed.*2d at 675. Deference is warranted

> because the responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones, and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated.
>
> [*FDA v. Brown & Williamson Tobacco Corp.,* 529 *U.S.* 120, 132, 120 *S.Ct.* 1291, 1300, 146 *L.Ed.*2d 121, 134 (2000) (internal quotation marks and citations omitted).]

 An agency's statutory interpretation is entitled to deference even when that agency has changed its interpretation over time. "An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rule-making, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron, supra,* 467 *U.S.* at 863–

64, 104 *S.Ct.* at 2792, 81 *L.Ed.*2d at 715–16; *see also Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.,* 463 *U.S.* 29, 42, 103 *S.Ct.* 2856, 2866, 77 *L.Ed.*2d 443, 457 (1983) (finding that agencies "must be given ample latitude to adapt their rules to the demands of changing circumstances") (internal quotation marks and citation omitted); *Brown & Williamson Tobacco Corp., supra,* 529 *U.S.* at 156–57, 120 *S.Ct.* at 1313, 146 *L.Ed.*2d at 149. However, when an agency changes its course, it must provide a "reasoned analysis." *Motor Vehicle Mfrs. Ass'n, supra,* 463 *U.S.* at 57, 103 *S.Ct.* at 2874, 77 *L.Ed.*2d at 466. In those instances in which Congress has not spoken directly to the issue, but "the agency's interpretation is reasonable," we must not reject "an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise." *United States v. Mead Corp.,* 533 *U.S.* 218, 229, 121 *S.Ct.* 2164, 2172, 150 *L.Ed.*2d 292, 305 (2001).

■ Although due deference must be given to an agency's interpretation of a statute in an area over which it has regulatory power, "the final word on statutory interpretation is for the courts." *Grunbeck, supra,* 74 *F.*3d at 341. Therefore, we must decide whether Congress conferred on OTS the authority to preempt states' prepayment penalty laws as they apply to AMTs. There is no doubt that OTS intended its regulation to preempt states' prepayment penalty laws. *1996 Final Rule, supra,* 61 *Fed.Reg.* at 50,983. The only issue to be resolved is whether OTS was authorized pursuant to the Parity Act to apply § 560.34, which protected federally-chartered housing lenders from laws forbidding prepayment penalties, to state-chartered housing lenders by its incorporation into 12 *C.F.R.* § 560.220.

## IV.

■ OTS currently takes the position that allowing the charging of prepayment penalties on an AMT is not intrinsic to the Parity Act's mandate. However, in 1996, construing parity to

mean competitive equality between state and federal housing lenders appeared a sensible interpretation of the language of the Act and a laudable goal. The Appellate Division has concluded that the 1996 version of 12 *C.F.R.* § 560.220 was a mistaken interpretation of the Parity Act based on OTS's change of course. *Glukowsky, supra,* 360 *N.J.Super.* at 31–34, 36, 821 *A.2d* 485. Regulatory law, however, is not static. It has elasticity that permits it to adapt to changing circumstances and conditions. In rejecting a challenge to the validity of rules promulgated by the Interstate Commerce Commission, the United States Supreme Court stated:

> Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.
>
> [*Am. Trucking Ass'ns, Inc. v. Atchison, Topeka & Santa Fe R. Co.,* 387 *U.S.* 397, 416, 87 *S.Ct.* 1608, 1618, 18 *L.Ed.2d* 847, 860 (1967).]

*See also In re PSE & G Co.'s Rate Unbundling,* 167 *N.J.* 377, 385, 771 *A.2d* 1163 (2001) (noting administrative agencies' ability to be flexible and responsive to changing conditions); *Heir v. Degnan,* 82 *N.J.* 109, 121–22, 411 *A.2d* 194 (1980) (observing advantage of administrative regulations is flexibility to keep pace with current needs). A regulatory agency is charged with the responsibility of adapting its regulations to changing conditions when enforcing a statute under its authority. *See, e.g., Bob Jones Univ. v. United States,* 461 *U.S.* 574, 596, 103 *S.Ct.* 2017, 2031, 76 *L.Ed.2d* 157, 176 (1983) (acknowledging IRS's administrative authority "to meet changing conditions and new problems"). In addressing rapidly changing and sometimes difficult to understand market conditions, a regulatory agency may experiment—within the scope of its authority—to meet the pressing needs of the moment. "One of the most significant advantages of the administrative process is its ability to adapt to new circumstances in a flexible manner...." *FCC v. Nat'l Citizens Comm. for Broad.,* 436 *U.S.* 775, 811, 98 *S.Ct.* 2096, 2120, 56 *L.Ed.2d* 697, 724 (1978).

Time and experience have taught OTS that preempting states' prepayment penalty laws is not essential to the goals of the Parity Act. State-chartered housing lenders that are barred by state law from charging prepayment fees will not necessarily be less profitable. Those lenders can do what lenders have always done—adjust their interest rates to compete in the marketplace. *2002 Notice of Proposed Rulemaking, supra,* 67 *Fed.Reg.* at 20,473. Real-world experience has shown OTS that a regulation that appeared eminently reasonable in 1996 is not necessary to achieve the paramount objectives of the Parity Act in 2003. That OTS altered its direction to better effectuate the purposes of the Parity Act does not require the conclusion that its 1996 interpretation of that Act was impermissible. OTS's commentary on its 2002 rule change speaks persuasively to that point:

> In this final rule, OTS has selected between two permissible interpretations of [the Parity Act] based upon a reevaluation of the statute. OTS has, in no way, concluded that the 1996 rule changes reflected an impermissible construction of its statute. Accordingly, there is no basis for arguing that the final rule applies retroactively to transactions consummated before the effective date.
> 
> [*2002 Final Rule, supra,* 67 *Fed.Reg.* at 60,550.]

 Further, the Appellate Division's reliance on the *2002 Notice of Proposed Rulemaking* to the exclusion of the *Final Rule* fails to account for the preliminary nature of proposed rulemaking. *See Dow Chem., USA v. Consumer Prod. Safety Comm'n,* 459 *F.Supp.* 378, 391 (W.D.La.1978) (recognizing informal rulemaking process as channel for participation by public, experts, and other constituencies to provide information on effects of proposed rules and to suggest alternatives). Established principles of administrative law require that a reviewing court defer to an agency's own resolution of a conflict between that agency's decisions. *See Smith v. Brown,* 35 *F.*3d 1516, 1527 (Fed.Cir.1994), *superseded by statute on other grounds stated by Disabled Am. Veterans v. Gober,* 234 *F.*3d 682 (Fed.Cir.2000), *rehearing denied* (2001). The Appellate Division accorded greater weight to commentary in the Proposed Rule than to commentary in the Final Rule. *Contra Christensen v. Harris County,* 529 *U.S.* 576, 587, 120 *S.Ct.* 1655, 1662–63, 146 *L.Ed.*2d 621, 631 (2000) (declining to accord *Chevron*

deference to informal agency pronouncements); *Madison v. Res. for Human Dev. Inc.*, 233 *F*.3d 175, 185 (3d Cir.2000) (acknowledging that informal agency interpretations are accorded less deference than regulations).

Unless there are compelling indications that OTS is wrong in concluding that there are two permissible interpretations of the Parity Act, we should exercise restraint before rushing to invalidate the 1996 regulation. *N.J. Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 575–76, 384 *A*.2d 795 (1978); *see also Matturri v. Bd. of Trs. of the Judicial Ret. Sys.*, 173 *N.J.* 368, 382, 802 *A*.2d 496 (2002).

## V.

In deciding whether OTS exceeded the scope of its authority in promulgating 12 *C.F.R.* § 560.220, we give due consideration to the interpretation of the Parity Act by the federal courts. Federal courts uniformly have concluded that the Parity Act allowed federal agencies to promulgate regulations preempting state laws governing prepayment penalties.

In *Shinn v. Encore Mortgage Services, Inc.*, *supra*, 96 *F.Supp.*2d at 424, 426, the district court determined that Congress had granted OTS broad authority to regulate state-chartered lenders engaged in AMTs and that the 1996 version of 12 *C.F.R.* § 560.220 preempted New Jersey's Prepayment Penalty Law, *N.J.S.A.* 46:10B–2, as applied to state-chartered lenders engaged in AMTs. *See also Glukowsky*, *supra*, 360 *N.J.Super.* at 31, 821 *A*.2d 485 (noting same result in unpublished decision of *Benay v. Ameriquest Mortgage Co.*, No. CIVA002173 DMC, 2001 *WL* 34120911, at *3 (D.N.J. June 29, 2001)). The district court reasoned that the Parity Act did not have the limited purpose of preempting only those "state laws, which would completely prohibit or obstruct the creation of AMTs." *Shinn*, *supra*, 96 *F.Supp.*2d at 425. The court rejected the plaintiffs' claims that "the sole purpose of the Act is to enable state lenders to engage in AMTs" and instead found that a "paramount purpose of the Act is to

create parity between state and federal lenders who engage in AMTs." *Ibid.* The court concluded that the regulation reflected "a permissible interpretation of the congressional authority vested in the OTS under the Parity Act." *Ibid.*

In *National Home Equity Mortgage Ass'n v. Face, supra,* 239 *F.*3d at 639–40, the United States Court of Appeals for the Fourth Circuit also endorsed the view that Congress delegated broad authority to OTS to regulate state-chartered housing creditors that elected to have their AMTs governed by the Parity Act. *Id.* at 639. The court found that in exercising that rulemaking authority, OTS was permitted to preempt not only those state laws that prohibited AMTs, but also those laws that denied state-chartered housing creditors competitive parity with federally-chartered lenders. *Id.* at 640. Consequently, the Court of Appeals held that 12 *C.F.R.* § 560.34 as incorporated into 12 *C.F.R.* § 560.220 preempted Virginia from enforcing against state lenders its laws limiting prepayment penalties involving AMTs. *Id.* at 635, 640.

In *McCarthy v. Option One Mortgage Corp., supra,* 362 *F.*3d at 1010–11, the Seventh Circuit Court of Appeals followed the analysis in *Face* and *Shinn* to hold that an Illinois law prohibiting prepayment penalties did not apply to an AMT paid off in 2001 under the Parity Act. Notably, *McCarthy* was decided after the rule change to 12 *C.F.R.* § 560.220 that eliminated the application of 12 *C.F.R.* § 560.34 to state-chartered lenders. The court found that the "Parity Act provides equal opportunity for state-chartered lenders to offer alternative mortgages as long as they comply with federal regulations." *Id.* at 1011. The court did not engage in a hindsight assessment of the 1996 version of 12 *C.F.R.* § 560.220 through the prism of the 2002 rule change. The court implicitly concluded that the 1996 regulation was a permissible interpretation of the Parity Act.

Last, in *National Home Equity Mortgage Ass'n v. OTS,* 271 *F.Supp.*2d 264, 268 (D.D.C.2003), the plaintiff challenged not the 1996 incarnation of 12 *C.F.R.* § 560.220, but whether the 2002 rule change was a valid expression of the authority delegated to OTS

by Congress. In that case, the plaintiff brought suit against OTS, challenging the removal of § 560.34 from 12 *C.F.R.* § 560.220, the effect of which was to allow state prepayment penalty laws to apply to AMTs. *Id.* at 268, 269. The district court held that the 2002 rule change by OTS was entitled to deference. *Id.* at 275. The court determined that "the text of [the Parity Act] clearly permits OTS to conclude that the Act requires it to identify only those regulations authorizing AMTs, and to define such regulations as those that are 'essential or intrinsic' to [a state-chartered lender's] ability to provide AMTs." *Id.* at 273. The district court found that the "the scope of the [Parity] Act's preemption is ambiguous," *id.* at 272, although suggestive of an intent by Congress "to preempt only those regulations authorizing AMTs," *id.* at 271. The court noted that plaintiff's reading of the statute as requiring preemption of all state laws governing AMTs was "one reasonable interpretation of the Parity Act, [although] it is not expressly required by the plain language of the Act, nor is it the only reasonable interpretation of the [the Parity Act's] terms." *Ibid.* Therefore, inferentially, OTS's 1996 adoption of 12 *C.F.R.* § 560.220 was a reasonable interpretation of the Act.

 Those federal court decisions, while not binding on New Jersey courts, are entitled to respectful consideration in the interests of judicial comity. Judicial comity helps to ensure uniformity and discourage forum shopping. *Dewey, supra,* 121 *N.J.* at 80, 577 *A.*2d 1239.

Finally, because OTS is the administrative agency charged with enforcement of the Parity Act, its opinion is entitled to great weight and is a substantial factor in our interpretation of the Act. *N.J. Guild, supra,* 75 *N.J.* at 575, 384 *A.*2d 795 (quoting *Youakim v. Miller,* 425 *U.S.* 231, 235, 96 *S.Ct.* 1399, 1402, 47 *L.Ed.*2d 701, 706 (1976)). We cannot conclude, based on the language of the Parity Act or its legislative history, that Congress would not have sanctioned OTS's interpretation of the Act. *See Fid. Fed., supra,* 458 *U.S.* at 153–54, 102 *S.Ct.* at 3022, 73 *L.Ed.*2d at 675 (citing *United States v. Shimer,* 367 *U.S.* 374, 381–82, 81 *S.Ct.* 1554, 1559–

60,.6 *L.Ed.*2d 908, 913–14 (1961)). Although the Appellate Division's view represents one reasonable interpretation of the authority granted to OTS under the statute, we find that it is not the only reasonable interpretation. We, therefore, cannot declare invalid OTS's decision to adopt the 1996 regulation.

## VI.

This case has brought to our attention a gap in our court rules. *Rule* 4:28–4(a) requires a party challenging the validity of a State statute, rule, regulation, executive order or franchise in a legal action to give notice of the challenge to the Attorney General. *Rule* 2:5–1(h) requires that notice to the Attorney General be provided when such a challenge is raised on appeal. However, we have no comparable rule requiring that notice be given to the attorney or chief legal officer of a federal department or agency when its laws or regulations are challenged in our courts. We, therefore, submit to the Civil Rules Practice Committee consideration of an appropriate revision to our rules that will require notice to be given to the appropriate federal officer and agency when a federal law or regulation is challenged in a New Jersey court.

## VII.

■■■ We hold that the New Jersey Prepayment Law was preempted by the 1996 version of 12 *C.F.R.* § 560.220. Accordingly, we reverse the decision of the Appellate Division, and reinstate the decision of the trial court dismissing plaintiff's complaint for failure to state a claim upon which relief can be granted.[9]

Justice ZAZZALI, dissenting.

The majority opinion represents a principled treatment of a complex problem. However, I do not believe that the·preemption

---

[9] Although our dissenting colleagues observe that "plaintiff might yet find relief by alleging a violation of 12 *C.F.R.* § 591.5(b)(2)(i)," we express no view on the validity of the filing of any new complaint.

doctrine applies. Therefore, I respectfully dissent. I would affirm the judgment of the Appellate Division substantially for the reasons expressed by Judge King in his comprehensive and well-reasoned opinion. *Glukowsky v. Equity One, Inc.*, 360 *N.J.Super.* 1, 821 *A.*2d 485 (2003).

I write further only to underscore the point that affording lenders protection under the 1996 regulation, which by now has been universally recognized as misguided, becomes especially unjust when viewed in conjunction with the sequence of events relating to the "opt-out" mechanism provided by Congress when it enacted the underlying legislation. *Ante* at 58–59, 848 *A.*2d at 752.

In passing the Parity Act, Congress afforded each state three years to assert its right not to be preempted by the federal regulatory scheme. 12 *U.S.C.A.* § 3804. Congress enacted the law including that provision in 1982, some fourteen years before the suspect 1996 regulation was promulgated. *Ante* at 58–59, 848 *A.*2d at 752. During the three-year window from 1982 to 1985, neither the New Jersey Legislature nor that of any other state could predict that the OTS, or any other regulatory agency, someday would turn the salutary congressional goal of ensuring the availability of alternative mortgages on its head by sanctioning what arguably amount to predatory lending practices by state-chartered institutions. As explained by Judge King, the countenance of those practices, by the federal regulators' own admission, finds no support in the intent manifested by Congress when it enacted the Parity Act. *Glukowsky, supra,* 360 *N.J.Super.* at 32–34, 821 *A.*2d 485. That such an *ultra vires* regulation came into being only after the states were no longer free to exempt themselves compounds the injustice of allowing such lending practices the safe-haven accorded by preemption in these circumstances.

Finally, by virtue of the rule that a dismissal under *Rule* 4:6–2(e) is presumptively without prejudice, *Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 *N.J.* 739, 772, 563 *A.*2d 31

(1989), plaintiff might yet find relief by alleging a violation of 12 *C.F.R.* 591.5(b)(2)(i). As the Appellate Division noted, that regulation prevents lenders from collecting prepayment penalties when they have demanded full payment under a due-on-sale clause. *Glukowsky, supra,* 360 *N.J.Super.* at 23–24, 821 *A.*2d 485.

Justice VERNIERO and Justice WALLACE join in this opinion.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices LONG, LaVECCHIA and ALBIN—4.

*For affirmance*—Justices VERNIERO, ZAZZALI and WALLACE—3.